# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANGELICA GALLEGOS
1301 SE McKinney Street
Rice, TX 75155

COLLENE TRAVERS
6501 Derby Drive
Bakersfield, CA 93306

JESSICA GRANGER
3456 Littlestown Pike
Westminster, MD 21158

ATHENA GOETTER
620 North Main Street
Williamstown, NJ 08094

HUNTER COOKE
272 Frogtown Rd
Hogansburg, NY 13655

DENNIS BAKER
2390 Highway 94
Pender, NE 68047

HECTOR BERMUDEZ
9425 41st Road
Elmhurst, NY 11373

THOMAS BURTON
3425 East 500 South
Oxford, IN 47971

MICHAEL CURLESS
320 Pleasant Street
Ashland, OH 44805

JOSEPH SLADKY
250 Sams Trail
Waynesville, NC 28786

Civ. No. _____

ALCRESTA THERAPEUTICS, INC.
130 Turner Street
Building 3, Suite 200
Waltham, MA 02453
                                        Plaintiffs,

v.

ROBERT F. KENNEDY, JR.
Secretary of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201,
                                        Defendant.

## COMPLAINT

## I.    NATURE OF ACTION

1.      This is an action under the Administrative Procedure Act for judicial review and declaratory and injunctive relief from final determinations of Defendant's Medicare Appeal Council ("Council") to grossly underpay and to effectively deny Medicare coverage for a novel medical device prescribed for patients with cystic fibrosis and pancreatic insufficiency in need of specialized enteral nutrition.  The device, RELiZORB, provides critical benefits for severely ill patients who suffer from severe fat malabsorption, often associated with cystic fibrosis, which can lead to life-threatening health issues.

2.      Plaintiffs here challenge Defendant's underpayment for RELiZORB on the same grounds as the plaintiffs in other litigation before this Court, *see Goetter v. Kennedy*, No. 25-cv-3100 (D.D.C. filed Sept. 9, 2025); *Henry v. Kennedy*, No. 21-cv-747 (D.D.C. filed Mar. 22, 2021); *Henry v. Kennedy*, No. 20-cv-1144 (D.D.C. filed May 1, 2020).  Despite the current lapse in federal government appropriations, the Medicare Appeals Council has continued to issue unfavorable final decisions for Plaintiffs' claims, with a 60-day statutory deadline for judicial review, that are materially identical to the decisions at issue in *Goetter*.

3.      Nearly seven years ago, the Court of Appeals found that the agency could not deny a usable medical code for RELiZORB necessary to pursue Medicare coverage and payment and ordered the agency to assign RELiZORB a code that would allow for "meaningful reimbursement." *Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 4 (D.C. Cir. 2018). Nevertheless, the agency has found different means to accomplish the same result of denying meaningful reimbursement for RELiZORB—an improperly and artificially low payment rate set *below* the wholesale acquisition cost to *suppliers* of the product, not even accounting for the additional costs of doing business for suppliers to provide RELiZORB to patients. Reimbursing suppliers less than the wholesale cost of a product (never mind their business costs) is unsustainable and promises to threaten access to this innovative, life-sustaining product for vulnerable Medicare patients.

4.      The agency's end-run around the Court of Appeals' decision has resulted in approximately 620 pending or soon-to-be-filed appeals from reimbursement determinations brought by approximately 140 Medicare patients who depend on RELiZORB to sustain themselves. Hundreds more appeals are in the pipeline because many patients use RELiZORB on an ongoing basis to mitigate the severe effects of chronic, incurable diseases like cystic fibrosis and short bowel syndrome. Accordingly, they must file additional claims every month for as long as they continue using RELiZORB. Of these claims, there are currently over 155 appeals that are pending before the Council, the highest level of the agency's administrative appeal process, and approximately 70 appeals pending before Administrative Law Judges ("ALJs"). Indeed, many of these beneficiaries have waited years for decisions on their appeals, and many have passed away without resolution of their claims. The agency's ongoing, unlawful reimbursement determinations

prejudice these beneficiaries, as well as Plaintiff and device manufacturer Alcresta Therapeutics, Inc.

5.     For the past several years, Plaintiff patients Angelica Gallegos, Collene Travers, Jessica Granger, Athena Goetter, Hunter Cooke, Dennis Baker, Hector Bermudez, Thomas Burton, Michael Curless, and Joseph Sladky have been challenging myriad unlawful reimbursement determinations.  Combined, Plaintiffs filed roughly 190 administrative appeals to challenge the agency's contractors' flawed reimbursement determinations for RELiZORB, and they have over 30 appeals pending before the Council.  After years of waiting on the appeals process to conclude, Plaintiffs finally received decisions from the Council adopting ALJ decisions upholding the agency contractors' impermissible underpayments for RELiZORB furnished to Plaintiffs for dates of service in 2021, 2022, and 2023.  These claims are now exhausted before the agency, and Plaintiffs must bring suit under the APA in order to preserve their right to reimbursement.

6.     The Council's decisions, all of which reach the same conclusions based on materially identical reasoning, should be overturned on the merits by this Court because they violate the Medicare statute and related agency rules prescribing a reasonable charge-based payment methodology for new enteral nutrition products and requiring Medicare coverage for medically necessary enteral nutrition and because they violate the D.C. Circuit's order that the Secretary remove barriers to meaningful reimbursement.  The Council's decisions are also invalid as arbitrary and capricious actions lacking any reasonable basis for departing from the standard gap-filling methodology, and for yielding payments far below the supplier's acquisition price and vastly out of line with other payors' reimbursement levels.  The Council's decisions are also unsupported by substantial evidence; there is no connection between the apparent starting point for the Medicare payments and the supplier's actual reasonable charges for the product.  Finally,

the agency effected these substantive changes to longstanding Medicare reimbursement standards without observance of the required agency procedure, including notice and opportunity for public comment, or fair notice of the changes before applying them to Plaintiffs' claims. The Council's decisions should thus be set aside and the agency directed to take action to ensure proper Medicare payment for the product.

## II.    JURISDICTION AND VENUE

7.      Jurisdiction is proper under 28 U.S.C. §§ 1331, 1361 and 42 U.S.C. § 1395ff.

8.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(e).

## III.    THE PARTIES

9.      Plaintiffs Angelica Gallegos, Collene Travers, Jessica Granger, Athena Goetter, Hunter Cooke, Dennis Baker, Hector Bermudez, Thomas Burton, Michael Curless, and Joseph Sladky are all Medicare beneficiaries who suffer from serious illnesses that require enteral feeding—*i.e.*, delivery of nourishment directly to a patient's gastrointestinal tract. Plaintiffs' physicians prescribed them RELiZORB to improve their diminished nutritional state and, thereby, improve their health. Plaintiffs seek adequate reimbursement for RELiZORB and seek to preserve continued patient access to it.

10.      Plaintiff Alcresta Therapeutics, Inc. is a small company focused on innovative enzyme-based products designed to address nutritional challenges faced by medically fragile persons living with gastrointestinal disorders and rare diseases. Alcresta developed and manufactures RELiZORB, a digestive enzyme-packed device that enhances enteral feeding for the sickest and most vulnerable of patients with cystic fibrosis, pancreatitis, pancreatic cancer, or other serious diseases who suffer from fat malabsorption and are, as a result, severely malnourished, underweight, have decreased lung function, and suffer from significant gastrointestinal symptoms.

RELiZORB helps the digestive process by breaking down fats in enteral-tube feeding formula into an absorbable form, enabling patients to absorb more calories and the essential fatty acids that are critical for growth and development, as well as reduce gastrointestinal symptoms associated with fat malabsorption.  Alcresta is the sole producer of RELiZORB.  No other pharmaceutical or medical device is approved or cleared by the Food and Drug Administration ("FDA") to fill this essential need for these severely ill, enterally fed patients.  Alcresta is headquartered in Waltham, Massachusetts.

11.    Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services ("HHS").  References to the Secretary are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

12.    The Centers for Medicare & Medicaid Services ("CMS") is the operational component of HHS to which the Secretary has delegated authority to oversee the operations of the Medicare program, as well as a nationwide, standard coding medical system known as Healthcare Common Procedure Coding System ("HCPCS"), which is used by health care providers, suppliers, and patients in submitting claims to all health care payors, including private insurers, Medicare, and Medicaid.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.  Medicare Coverage and Payment for Enteral Nutrition

13.    The Medicare program, administered by CMS, provides health insurance for aged and disabled Americans under Title XVIII of the Social Security Act, the Medicare statute.  42 U.S.C. § 1395 *et seq.*

14.    Part B of the Medicare statute offers beneficiaries coverage for certain medically "reasonable and necessary" costs for "medical and other health services," including enteral nutrition products.  42 U.S.C. §§ 1395y(a)(1)(A) (noting Part B pays for reasonable and necessary

costs); 1395k(a)(2)(B) (providing Part B coverage for "medical and other health services"), 1395k(a)(2)(I) (providing Part B coverage for "prosthetic devices"); 42 C.F.R. § 421.210(b)(2) (designating Durable Medical Equipment, Prosthetics, and Orthotics ("DMEPOS") claims as including enteral nutrition and supplies); Medicare Benefit Policy Manual, ch. 15, § 120.A (agency defining "prosthetic devices" to include "parenteral and enteral (PEN) nutrition"); Medicare Claims Processing Manual ("Manual"), ch. 20, § 10 (establishing claim payment process for PEN items and stating that PEN items fall under Durable Medical Equipment Medicare Administrative Contractor ("DME MAC" or "MAC") payment approvals).

15.    A "national coverage determination" ("NCD") is "a determination by the Secretary with respect to whether or not a particular item or service is covered nationally" by Medicare.  42 U.S.C. §§ 1395ff(f)(1)(B), 1395y(l)(6)(A).  A "local coverage determination" ("LCD") is "a determination by a fiscal intermediary or carrier . . . respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis."  42 U.S.C. §§ 1395ff(f)(2)(B), 1395y(l)(6)(B).

16.    In 1984, CMS adopted an NCD for Enteral and Parenteral Nutritional Therapy (180.2), providing that enteral nutrition is considered "reasonable and necessary" where "a patient with a functioning gastrointestinal tract who, due to pathology to, or non-function of, the structures that normally permit food to reach the digestive tract, cannot maintain weight and strength commensurate with his or her general condition."[1]  In February 2021, all four DME MACs published a proposed "joint" and nationwide LCD ("the joint LCD") for enteral nutrition that

---

[1] *See National Coverage Determination (NCD) for Enteral and Parenteral Nutritional Therapy (180.2),* Centers for Medicare & Medicaid Services, (July 11, 1984), https://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=242&ncdver=1&DocID=180.2&SearchType=Advanced&bc=IAAAABAA AAAA&.

would provide coverage for RELiZORB under the then-controlling NCD by providing that RELiZORB is a reasonable and necessary treatment for Medicare beneficiaries who meet the enteral nutrition coverage criteria and have a diagnosis of endocrine pancreatic insufficiency.[2] Accordingly, effective January 1, 2022, CMS determined NCD 180.2 was no longer "appropriate," so the MACs now simply determine coverage of enteral and parenteral nutritional therapy pursuant to their local coverage policies and 42 U.S.C. § 1395y(a), rather than the NCD.[3]  That statutory provision conditions Medicare coverage on items and services being "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

17.    The Medicare statute and regulations generally provide for payment under a nationwide fee schedule for enteral nutrition based on reasonable charges from a prescribed base period, 1995.  *See* 42 C.F.R. § 414.104(b) (establishing 1995 base year for PEN from 2002 onwards); *see also* 42 U.S.C. §§ 1395u(a), (s), 1395m(a)(2)-(3), (8); Balanced Budget Act of 1997, Pub. L. No. 105-33 § 4551(b), 111 Stat. 251, 457-58; 66 Fed. Reg. 45,173, 45,174 (Aug. 28, 2001); 83 Fed. Reg. 56,922, 57,046 (Nov. 14, 2018); 42 C.F.R. §§ 405.502, 414.102(a), 414.105, 414.442(b).  CMS updates the enteral nutrition fee schedule on a periodic basis.  *See* 42 C.F.R. § 414.210(g) (discussing fee schedule adjustments for competitive bidding programs); *id.* § 414.105 (noting fee schedule amounts "[f]or enteral nutrients, equipment and supplies furnished

---

[2] *See Proposed Local Coverage Determination (LCD): Enteral Nutrition (DL38955)*, Centers for Medicare & Medicaid Services, (Feb. 25, 2021), https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=38954&ver=10.

[3] CMS formally retired NCD 180.2 in 2023.  *See* Dep't of Health & Hum. Servs., CMS Manual Sys., Pub. 100-03, Transmittal 11892 at 2, 14 (Mar. 9, 2023), https://www.cms.gov/files/document/r11892ncd.pdf (determining "no national coverage determination (NCD) is appropriate at this time" and directing coverage pursuant to 42 U.S.C. § 1395y(a)).

on or after January 1, 2011[,] . . . may be adjusted" based on competitive bidding methodologies established in 414.210(g); *id.* § 414.422(b) (noting CMS "recompetes competitive bidding contracts at least once every 3 years"). As acknowledged by CMS, "reasonable charges" reflect "all costs associated with furnishing items directly to the customer," including acquisition costs, as well as "overhead and all business expenses, [and] delivery." 84 Fed. Reg. 60,648, 60,740 (Nov. 8, 2019).

18.     CMS also administers HCPCS, the nationwide, standard coding system that is used by health care providers, suppliers, and patients in submitting claims to all health care payors, including private insurers, Medicare, and Medicaid. 42 U.S.C. § 1320d-2; 45 C.F.R. § 162.1002.

19.     CMS established a "Workgroup" to make recommendations on requests for new codes. 66 Fed. Reg. 58,743, 58,744 (Nov. 23, 2001). The Workgroup's final decision becomes the final agency decision. *See* CMS, Healthcare Common Procedure Coding System (HCPCS) Level II Coding Procedures 9 (Nov. 26, 2019) (hereinafter "2019 Coding Guidelines"),[4] 76 Fed. Reg. 24,034, 24,034 (Apr. 29, 2011). The Workgroup consists of members from CMS, other federal agencies, state Medicaid agencies, and the private insurance sector. 2019 Coding Guidelines.

20.     An item qualifies for a new code if it (a) performs a significantly different function than, (b) operates differently from, or (c) has a significant therapeutic distinction from other HCPCS Level II-coded products. *See* HCPCS Decision Tree at 1 (revised Nov. 29, 2018).[5]

---

[4] https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2018-11-30-HCPCS-Level2-Coding-Procedure.pdf.

[5] Centers for Medicare & Medicaid Services, *HCPCS Decision Tree* (revised Nov. 29, 2018), https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/HCPCS_Decision_Tree_and_Definitions.pdf/.

21.     This coding plays a critical role in the success of new medical devices because a separate code is a necessary predicate to payment or coverage by public and private insurers. *See Alcresta*, 755 F. App'x at 4-5 (despite that "[c]oding and pricing may well be two separate processes," "[h]ere, Relizorb's encumbered code acts as an absolute barrier to meaningful reimbursement," and it is "reasonably possible that a new billing code would prompt HHS to reimburse Relizorb separately"). Without a valid code, a medical claim cannot be processed, paid, covered, or even appealed. *See id.* (describing the importance of coding decisions).

22.     For a newly coded product that is not yet on the national fee schedule, like RELiZORB,[6] a Medicare contractor is required to set a payment amount based on a predetermined "gap-filling" methodology reflecting suppliers' reasonable charges for the product and local pricing factors. *See* 42 U.S.C. § 1395u(a), (s) (calling for use of "[M]edicare [A]dministrative [C]ontractors" to administer Part B based on reasonable charges); 42 U.S.C. § 1395m(a)(2)-(3), (8) (mandating that fee schedule amounts for DMEPOS generally be based on average reasonable charges from 1986 and/or 1987, increased by annual covered item update factors); 42 C.F.R. § 414.102(a) (requiring payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service"); Manual, ch. 23, §§ 60, 60.3 (directing contractors to "gap-fill" the fee schedule "for items for which charge data were unavailable during the fee schedule data base year" using supplier prices when there is no national or neighboring regional fee schedule amount for new item or other comparable equipment); 42 U.S.C. § 1395m(a)(14)(L) (describing payment rules for covered DMEPOS items); s*ee also Almy v. Sebelius*, 679 F.3d 297, 311 n.4 (4th Cir. 2012) (distinguishing gap-filled payment amounts from national fee schedule amounts).

---

[6] *See* DMEPOS Fee Schedule, Centers for Medicare & Medicaid Services, *available at* https://www.cms.gov/medicare/payment/fee-schedules/dmepos/dmepos-fee-schedule      (last checked on August 26, 2025).

23.    The Manual explains that the gap-filling process requires updating the 1995 base year reasonable charges for an item to the current year's price by deflating current charges to the relevant base year, then updating that figure to reflect increases in the consumer price index over time.  Manual, ch. 23, § 60.3; 42 C.F.R. § 414.104(b) (establishing 1995 base year for PEN from 2002 onwards).

24.    For purposes of deriving payment for DMEPOS, including enteral nutrition, "reasonable charge determinations are generally based on customary and prevailing charges derived from historic charge data."  72 Fed. Reg. 17,992, 17,994 (Apr. 10, 2007); Manual, ch. 20, § 10.  To determine customary charges, Medicare contractors are required to use, "to the extent possible, the actual charges."  Manual, ch. 23, § 80.3.l.

25.    But the Manual contemplates the use of other data for "new services," *id.* § 80.2, providing that "[c]ustomary charges may be established using price lists" of the supplier "when there is inadequate charge data," *id.* § 80.3.1.  *See id.* § 60.3 (discussing use of "supplier price lists" in gap-filling).  The Manual recognizes that charges (which are generally above the wholesale acquisition price paid by the supplier) may vary by supplier and separately provides that, "[i]f it is necessary to establish customary charges using price lists, [the DME MACs] use these customary charges to also establish the required prevailing charges.  (*See* § 80.3.1.)."  *Id.* § 80.4.

26.    CMS made clear in rulemaking that gap-filled payment amounts should reflect "costs associated with furnishing items directly to the customer, including overhead and all business expenses such as licensure and accreditation, debt collection, credit cards, filing health insurance claims, delivery, set-up, and education."  84 Fed. Reg. 60,648, 60,740 (Nov. 8, 2019). The agency has further directed that the manufacturer's suggested retail price ("MSRP") "should

not be used for gap-filling due to CMS's concerns that MSRPs may not represent routinely available supplier price lists, which are incorporated for supplier charges in calculating fee schedule amounts that the statute mandates be based on historic reasonable charges. *Id.* at 60,730.[7]

27.     After determining the reasonable charges, the Manual requires the application of certain adjustment factors to arrive at the gap-filled payment amount if the charges are not from the 1995 base year for PEN items.   Manual, ch. 23, § 60.3; *see* 42 U.S.C. § 1395u(s)(2)(D) (establishing PEN fee schedule); Pub. L. No. 105-33 § 4551(b), 111 Stat. 251, 457-58 (establishing 1995 base year for PEN fee schedule for 1998 to 2002); 42 C.F.R. § 414.104(b) (establishing 1995 base year for PEN fee schedule from 2002 onwards).

28.     First, a deflation factor specified in the current year implementation instructions is applied to the charges in order to approximate charges for the 1995 base year.   Manual, ch. 23, § 60.3.   Second, the result of applying the deflation factor is updated to the current year by applying the "cumulative" updates. *Id.*[8]   Payment is 80% of the amount calculated after application of these adjustment factors.   42 C.F.R. § 414.102(a).

29.     In 1986, Congress mandated a 60-day notice-and-comment period for Medicare Regulations.   Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9321(e)(1), 100 Stat. 1874, 2017 (codified at 42 U.S.C. §§ 1395hh(a)(1), 1395hh(b)).   Congress later amended the

---

[7] The supplier's acquisition cost is just one factor in the ultimate consumer price of a product, which may reflect the supplier's business costs, as well as later determinations by insurers including the potential for payment claw backs within three years of claim processing. *See, e.g.*, Declaration of James Gamgort, *Alcresta Therapeutics, Inc. v. Azar*, No. 18-243 (D.D.C. Feb. 27, 2018), Dkt. No. 8-23 (explaining various factors that affect price of RELiZORB).

[8] *See 2019 Update for DMEPOS Fee Schedule*, at 5, CMS.gov (Jan. 2019), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/Downloads/MM11064.pdf ("For gap-filling pricing purposes, deflation factors are applied before updating to the current year."); *see also* 42 U.S.C. § 1395m(a)(14)(L) (describing payment rules for covered durable medical equipment items).

Medicare statute to establish additional, particularized notice-and-comment rulemaking requirements.  Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4035, 101 Stat. 1330, 1330-78.  As amended, the statute mandates that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services . . . shall take effect unless it is promulgated by the Secretary by regulation," 42 U.S.C. § 1395hh(a)(2), through notice-and-comment rulemaking, *id.* § 1395hh(a)(1).  When "manual instructions, interpretive rules, statements of policy, and guidelines of general applicability" are not required to be promulgated through notice and comment, then the agency must at least list them in the Federal Register.  *Id.* § 1395hh(c)(1).  *See* H.R. Rep. No. 100-495, at 563 (1987) (Conf. Rep.), reprinted in 1987 U.S.C.C.A.N. 2313-1245, 2313-1309 (describing provision as requiring publication of list of "interpretative rules" "which . . . are not published as required by [§ 1395hh(a)(2)] above").  In addition, "[a] substantive change in regulations, manual instructions, interpretive rules, statements of policy, or guidelines of general applicability . . . shall not be applied . . . retroactively to items and services furnished before the effective date of the change," except under circumstances not relevant here.  42 U.S.C. § 1395hh(e)(1)(A).

30.    The Medicare statute also imposes procedural requirements for NCDs and LCDs, including notice and comment.  42 U.S.C. §§ 1395y(a), 1395y(I)(1)-(4).  In particular, the statute requires: (1) notice and opportunity for public comment on a draft proposed determination; (2) meetings of advisory committees made on the record with respect to the determination; (3) consideration of applicable clinical experience and medical, technical, and scientific evidence with respect to the subject matter of the determination; and (4) a clear statement in the final determination of the basis for the determination (including responses to comments received from

the public), the assumptions underlying that basis, and the availability to the public of the data (other than proprietary data) considered in making the determination.  *Id.*

**B.  Challenges to Medicare Contractor Claims Determinations**

31.    The MACs make initial determinations on Medicare coverage and payment.  *See* 42 U.S.C. § 1395kk-1 (authorizing use of contractors to determine "the amount of the payments required pursuant to [the Medicare statute]"); 42 C.F.R. §§ 405.920, 405.924(b); *see also* 42 C.F.R. §§ 421.400 (codifying use of MACs), 421.100 (contractors "determin[e] the amount of payments to be made" on claims).  When making claim determinations, the MACs are bound by the Medicare statute, the controlling regulations, applicable NCDs, and agency manuals.  *See* 42 U.S.C. § 1395kk-1 (contractors are bound by Medicare statute in determining payment amounts on behalf of Secretary); 42 C.F.R. § 405.1063 ("All laws and regulations pertaining to the Medicare and Medicaid programs" are binding in claims process); *id.* § 405.1060(a)(4) ("An NCD is binding" on program contractors); Manual, ch. 1, § 01 ("[T]he instructions in this chapter apply . . . to the contractors that process [Medicare] claims.").

32.    A party dissatisfied with the MAC's initial determination may pursue an appeal by first requesting a "redetermination" by the same contractor.  42 U.S.C. § 1395ff(a)(3)(A); 42 C.F.R. §§ 405.906, 405.940, 405.942.  Medicare beneficiaries and suppliers are considered parties to initial determinations with appeal rights, while device manufacturers like Alcresta are not parties and therefore have no administrative recourse.  *See* 42 C.F.R. § 405.906(a)(1)-(2) (defining parties to initial determinations).

33.    If the party remains dissatisfied after this first level of administrative appeal, the party may pursue the claim further in the administrative appeals process.  42 U.S.C. § 1395ff(c)(3)(B), (d)(1)(A); *see generally* 42 C.F.R. § 405.904 (describing claims appeals process).  The second appeal level is a "reconsideration" conducted by a different contractor that

the agency calls a "Qualified Independent Contractor" ("QIC").  42 U.S.C. § 1395ff(c) (establishing reconsiderations by QICs); 42 C.F.R. § 405.960 *et seq.* (explaining reconsideration process).  "The Centers for Medicare and Medicaid Services (CMS) oversees initial determinations and redeterminations by the MACs, as well as reconsideration by the QICs."  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 185 (D.C. Cir. 2016).  The QIC's decision is subject to review at the third level by ALJ, 42 C.F.R. § 405.1000 *et seq.*, and the administrative process typically culminates with a review at the fourth level by the Council, 42 C.F.R. § 405.1100 *et seq.*, which is "a division of the Departmental Appeals Board (DAB)" that reviews claims.  *Am. Hosp. Ass'n*, 812 F.3d at 186.  A Council decision constitutes a final agency determination subject to judicial review.  42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1136.

34.    The Council's decision must be based upon *de novo* review of the administrative record built through earlier administrative proceedings.  *See* 42 C.F.R. § 405.1000(d) (explaining that "[t]he ALJ . . . conducts a de novo review and issues a decision based on the administrative record"); *id.* § 405.1122(a) ("If the Council is reviewing an ALJ's . . . decision, the Council limits its review of the evidence to the evidence contained in the record of proceedings before the ALJ . . . .").

35.    A party may seek judicial review in federal district court of an unfavorable Council decision, the final agency decision, within 60 days of the date on which it receives the Council's decision. 42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1130.  A party is also authorized to escalate an appeal to the Council if the Council fails to act on an appeal within a statutory timeframe and the party satisfies the requirements for requesting escalation, as occurred in a prior 2021 case pending before this Court, *Henry v. Kennedy*, No. 1:21-cv-747 (CKK) (D.D.C. 2021) [hereinafter *Henry II*].  *See* 42 U.S.C. § 1395ff(d)(2)(A) (establishing timeframe for decision); *id.* §

1395ff(d)(3)(B) (explaining "[c]onsequences of [Secretary's] failure to meet deadlines"); 42 C.F.R. § 1100(c)-(d) (establishing timeframe for review); *id.* § 1102(a) (authorizing escalation to federal court when the Council fails to issue a decision within the mandated timeframe and no extension applies).

## V.   FACTS SPECIFIC TO THIS CASE

36.   Plaintiffs are all Medicare beneficiaries who suffer from severe ailments and were prescribed RELiZORB to hydrolyze fats in enteral formula to address their diminished nutritional state and their overall health.  The medical necessity of their treatment with RELiZORB for the dates of service at issue here, which range from May 2021 to June 2023, is not disputed.  Plaintiffs seek adequate reimbursement for RELiZORB and seek to preserve continued patient access to it.

## A.  Plaintiff Patients and Their Use of RELiZORB

37.   Plaintiff Angelica Gallegos is a 48-year-old female patient diagnosed with cystic fibrosis who also suffers from type 1 diabetes, neuropathy, and vanishing white matter disease. She also requires small bowel tube feeding.  Her official Medicare diagnosis code is K86.81 (exocrine pancreatic insufficiency).  Her physician prescribed two cartridges of RELiZORB daily to hydrolyze 1,560 mL of supplemental enteral formula.  At the time of the claim, Ms. Gallegos was enrolled in Medicare Part B and Medicaid.  The date of service at issue here is May 4, 2021.

38.   Plaintiff Collene Travers is a 69-year-old female patient suffering from pancreatitis, complicated by small bowel resections for recurrent small bowel obstructions, antiphospholipid syndrome, and duodenal AVM.  Her official Medicare diagnosis codes are E43 (unspecified severe protein-energy malnutrition), K90.9 (unspecified intestinal malabsorption), K56.609 (intestinal obstruction), and K86.81 (exocrine pancreatic insufficiency).  Her physician prescribed two cartridges of RELiZORB daily to hydrolyze 1,250 mL of supplemental enteral nutrition. At the

time of the claims, Ms. Travers was enrolled in Medicare Part B and Medicaid. The dates of service at issue here are September 2, 2021, and December 23, 2021.

39.    Plaintiff Jessica Granger is a 42-year-old female patient diagnosed with cystic fibrosis who also suffers from pancreatic insufficiency, liver disease, and malnutrition. Her official Medicare diagnosis code is E84.9 (cystic fibrosis). Her physician prescribed one cartridge of RELiZORB daily to hydrolyze 500 mL of supplemental nutrition. At the time of the claims, Ms. Granger was enrolled in Medicare Part B and Medicaid. The dates of service at issue here are September 24, 2021, and October 1, 2022.

40.    Plaintiff Athena Goetter is a 33-year-old female patient diagnosed with cystic fibrosis who also suffers from pancreatic enzyme insufficiency and fat malabsorption. Her official Medicare diagnosis code is E84.0 (cystic fibrosis with pulmonary manifestations). Her physician prescribed one cartridge of RELiZORB daily to hydrolyze 960 mL of supplemental enteral formula. At the time of the claims, Ms. Goetter was enrolled in Medicare Part B and Medicaid. The dates of service at issue here are October 2, 2021, February 7, 2022, March 4, 2022, April 4, 2022, and July 3, 2022.

41.    Plaintiff Hunter Cooke is a 23-year-old-male patient who suffers from cystic fibrosis and pancreatic insufficiency, who receives hemodialysis three times per week and is a candidate for renal transplantation. His official Medicare diagnosis codes are E84.8 and K86.89, which indicate pancreatic insufficiency due to cystic fibrosis. His physician prescribed two cartridges of RELiZORB daily to hydrolyze 1,185 mL of supplemental enteral formula. At the time of the claim, Mr. Cooke was enrolled in Medicare Part B and Medicaid. The date of service at issue here is December 24, 2021.

42.     Plaintiff Dennis Baker is a 70-year-old-male patient who suffers from paroxysmal atrial fibrillation, gallstone pancreatitis, biliary obstruction, and necrotizing pancreatitis causing peripancreatic acute necrotic collection.  His official Medicare diagnosis codes are K91.89 and K85.90, which indicate post-endoscopic retrograde cholangiopancreatography pancreatitis.  His physician prescribed two cartridges of RELiZORB daily to hydrolyze 1,200 mL of supplemental enteral formula.  At the time of the claim, Mr. Baker was enrolled in Medicare Part B and had supplemental insurance.  The date of service at issue here is November 26, 2022.

43.     Plaintiff Hector Bermudez is a 29-year-old male patient who suffers from cystic fibrosis, related pancreatic insufficiency, malabsorption, malnutrition, and hypercapnic respiratory failure.  His official Medicare diagnosis code is E84.9 (cystic fibrosis).  His physician prescribed two cartridges of RELiZORB daily to hydrolyze 750 mL of supplemental enteral formula.  At the time of the claims, Mr. Bermudez was enrolled in Medicare Part B.  The dates of service at issue here are December 2, 2022, and December 31, 2022.

44.     Plaintiff Thomas Burton is a 79-year-old male patient who had a total pancreatectomy on December 5, 2019, and suffers from fat malabsorption and pancreatic insufficiency.  His official Medicare diagnosis code is K90.9 (intestinal malabsorption, unspecified).  His physician prescribed one cartridge of RELiZORB daily to hydrolyze 1,530 mL of supplemental enteral formula.  At the time of the claim, Mr. Burton was enrolled in Medicare Part B.  The date of service at issue here is June 28, 2023.

45.     Plaintiff Michael Curless is a 44-year-old male patient diagnosed with cystic fibrosis who also suffers from abnormal fasting glucose.  His official Medicare diagnosis code is E84.9 (cystic fibrosis).  His physician prescribed one cartridge of RELiZORB daily to hydrolyze

500 mL of supplemental enteral formula.  At the time of the claim, Mr. Curless was enrolled in Medicare Part B and Medicaid.  The date of service at issue here is September 11, 2023.

46.    Plaintiff Joseph Sladky is a 69-year-old male patient diagnosed with exocrine pancreatic insufficiency who also suffers from pancreatic head adenocarcinoma and severe protein calorie malnutrition.  His official Medicare diagnosis code is K86.81 (exocrine pancreatic insufficiency).  His physician prescribed two cartridges of RELiZORB daily to hydrolyze 1,008 mL of supplemental enteral formula.  At the time of the claim, Mr. Sladky was enrolled in Medicare Part B and had supplemental insurance.  The date of service at issue here is November 23, 2023.

## B. Alcresta and RELiZORB

47.    Plaintiff Alcresta developed and manufactures RELiZORB—a breakthrough, one-of-a-kind medical product that helps frail and malnourished patients achieve a healthy body weight by breaking down the formula used in feeding tubes.  The agency's ongoing refusal to reasonably and adequately reimburse for RELiZORB jeopardizes access to the product for medically fragile Medicare patients like Plaintiffs and many others.  Alcresta is a small "start up" company founded in 2011 to "focus[] on solving one unique unmet medical need: alleviation of fat malabsorption in very ill patients suffering from pancreatic insufficiency."  Alcresta spent its first years developing and securing regulatory approval for RELiZORB, which launched in December 2015 shortly after the FDA cleared it for prescription use.  RELiZORB is currently the company's lead and only product.[9]  Alcresta's continuing viability as a company, and its ability to continue to produce RELiZORB for those in need, depends in large part on its ability to secure adequate and

_____

[9] *See Our Products*, Alcresta Therapeutics, https://www.alcresta.com/products/#relizorb (last visited August 26, 2025).

appropriate Medicare reimbursement for RELiZORB claims, which also affects reimbursement by other payors. *Alcresta,* 755 F. App'x at 5; Ex. 10, Declaration of Anastasios Konidaris ¶ 3, *Henry v. Azar*, No. 1:20-cv-01144-CKK (D.D.C. May 3, 2020), Dkt. No. 8-11 ("The lack of Medicare and Medicaid coverage for RELiZORB and the low rate of other insurance coverage (many private insurers follow Medicare) . . . are having an increasingly devastating impact on Alcresta.").

48.     RELiZORB facilitates absorption of essential fats in patients suffering from severe fat malabsorption resulting from pancreatic insufficiency associated with cystic fibrosis and other serious pancreatic conditions. Fat malabsorption can lead to impaired lung function, significant gastrointestinal problems, decreased caloric intake, reduced digestion of essential fats, vitamin deficiencies, and suboptimal brain and vision development. Fatty acid abnormalities are significant in the cystic fibrosis population. For example, low omega-3 fatty acid levels have been associated with lower lung function.

49.     RELiZORB mimics normal pancreatic function by breaking down fats in formula used for enteral tube feeding by exposing the formula to a special digestive enzyme immediately before it enters the body.[10] It is a small, single-use cartridge that connects in-line between the feeding pump and the patient as part of the enteral feeding pump tubing set-up. Clinical trials and other studies provide evidence of RELiZORB's therapeutic benefit, including improvements in fatty acid absorption, omega-3 absorption, frequency and severity of gastrointestinal symptoms

---

[10] *See Hydrolyze Fats, Normalize Absorption of Fatty Acids*, Alcresta Therapeutics, http://relizorb.com/patient/why-relizorb (last visited Sept. 9, 2025); *see also RELiZORB Patient Guide*, ALCRESTA THERAPEUTICS (Jan. 2020), https://www.relizorb.com/docs/pdfs/Relizorb-Patient-Guide.pdf (RELiZORB patient guide describing product and its use); https://www.relizorb.com/docs/pdfs/Relizorb-Instructions-for-Use.pdf (RELiZORB Instructions for Use, including summary of clinical data).

from fat malabsorption, higher weight, and appetite.[11]  The results of a recently completed 12-month observational study show that use of RELiZORB led to significant weight and height improvements for cystic fibrosis patients requiring tube feeding.[12]  In addition, in a medical journal article, the Pancreas Committee of the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition recommended the use of RELiZORB for patients with chronic pancreatitis that experience poor weight gain or malabsorption of fats.[13]

50.    There is no other effective alternative to hydrolyze fats in enteral formula for seriously ill patients like Plaintiffs.  RELiZORB is the only point-of-care product currently available that breaks down fats throughout a full enteral feeding session, which may last six-to-ten

---

[11] *See* David Orenstein, et al., *Safety, Tolerability, and Fat Absorption Using a Novel In-line Digestive Enzyme Cartridge (RELiZORB) in Patients with Cystic Fibrosis Receiving Enteral Nutrition* (Jan. 2017); John Stevens et al., *Long-Term Use of RELiZORB by Children and Adults with CF Receiving Enteral Feeding (EF) Increases Omega 3 Fatty Acid Levels and Improves Nutritional Parameters*, 52 Pediatric Pulmonology (Issue Supplement S47), S1, S450 (Sept. 2017), https://onlinelibrary.wiley.com/doi/epdf/10.1002/ppul.23840; C. Iwanicki, et al., *Use of Immobilized Lipase Cartridge with Overnight Enteral Feeds Improves Symptoms and Results in Weight Gain in Children with Cystic Fibrosis*, 52 Pediatric Pulmonology at S452-53; M. Minor, et al., *Digestive Enzyme Cartridge (RELiZORB) During Continuous Enteral Feeds Among Individuals with Cystic Fibrosis*, 52 Pediatric Pulmonology at S459; S. Hendrix, et al., *Use of an In-Line Digestive Enzyme Cartridge in Pediatric Patients*, 52 Pediatric Pulmonology at S461; Steven D. Freedman et al., *Absorption and Safety with Sustained Use of RELiZORB Evaluation (ASSURE) Study in Patients with Cystic Fibrosis Receiving Enteral Feeding* (Mar. 10, 2018), https://journals.lww.com/jpgn/Abstract/publishahead/Absorption_and_Safety_with_Sustained_Use_of.96711.aspx.

[12] *See* Forest Ray, *Relizorb Use Supports Weight Height Gains in Tube-fed Patients, Study Finds*, Cystic Fibrosis News Today (Nov. 16, 2020), https://cysticfibrosisnewstoday.com/2020/11/16/relizorb-use-supports-weight-height-gains-cf-patients-tube-feeding/ (article discussing RELiZORB study results).

[13] *See* Medical Management of Chronic Pancreatitis in Children: A Position Paper by the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition Pancreas Committee, https://journals.lww.com/jpgn/Fulltext/2021/02000/Medical_Management_of_Chronic_Pancreatitis_in.30.aspx.

hours overnight.[14]  Indeed, the FDA cleared RELiZORB in 2015 through the *de novo* process that

only applies where there is no substantially equivalent product on the market.  *See* 21 U.S.C.

§ 360c(f)(2)(A)(ii) (permitting *de novo* clearance); 82 Fed. Reg. 47,969, 47,970 (Oct. 16, 2017)

(describing FDA clearance of RELiZORB through *de novo* process).

## C.  Prior Litigation

### 1.  *Coding Litigation in the District Court*

51.      After receiving FDA approval for RELiZORB in November 2015, Alcresta

requested that the product be assigned a unique HCPCS code in December 2015.  A separate code

would allow public and private payors to process and pay claims for RELiZORB.  The agency,

through its HCPCS Workgroup, denied this request in spring 2016, determining that RELiZORB

was adequately covered by an existing code that covered enteral nutrition supply kits.[15]  Alcresta

requested reconsideration of this decision, which the agency denied in November 2016.

52.      Alcresta applied again for a separate code in January 2017.  The Workgroup issued

a preliminary decision and again denied the request in June 2017.[16]  Alcresta again requested

reconsideration.  Several stakeholders, including children's hospitals across the country, supported

Alcresta's request.  They described improvements in their cystic fibrosis patients as a result of

---

[14] *Safety, Tolerability, and Fat Absorption Using a Novel In-line Digestive Enzyme Cartridge (RELiZORB) in Patients with Cystic Fibrosis Receiving Enteral Nutrition* (Jan. 2017); 2018 Alpha-Numeric HCPCS Coding Recommendation Format, Information Supporting Coding Modification Recommendation.

[15] Centers for Medicare & Medicaid Services, *Healthcare Common Procedure Coding System (HCPCS) Application Summaries for DME and Accessories; O & P; Supplies and Other* 16-17 (June 1, 2016) (providing relevant information with unnumbered document pages), https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2016-06-01-HCPCS-Application-Summary.pdf (last visited Sept. 9, 2025).

[16] Centers for Medicare & Medicaid Services, *Healthcare Common Procedure Coding System (HCPCS) Public Meeting Agenda* 32-33 (June 8, 2017) (document pages unnumbered), https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/Downloads/2017-06-08-HCPCS-Public-Meeting-Agenda.pdf (last visited Sept. 9, 2025).

RELiZORB and emphasized the difficulty in patient access due to lack of a separate code, which, they explained, leads insurers to deny their patients' claims for RELiZORB.  But the Workgroup again denied reconsideration in November 2017, finding that RELiZORB was covered by a code that covered enteral supply kit materials, including tubes, dressing, and clamps.

53.    In January 2018, Alcresta submitted another application for a separate permanent billing code for RELiZORB.    In May 2018, CMS published its "preliminary HCPCS recommendation" online, again denying a separate usable code.

54.    Meanwhile, in early 2018, Alcresta and another Medicare beneficiary filed an action seeking preliminary injunctive relief requiring the agency to remove RELiZORB from the bundled enteral feeding kit code, issue a temporary injunction pending Alcresta's 2018 code application, and require the agency to follow proper procedure when considering that application. *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 323 (D.D.C. 2018).

55.    In response, in April 2018, CMS purported to rescind its 2017 coding determination and removed RELiZORB from the published list of products included in the bundled kit code.  *See Alcresta*, 755 F. App'x at 3-4.  The agency, however, did not issue a new decision on the 2017 application, and continued to treat RELiZORB under the bundled kit code.

56.    The following month, the agency issued a unique temporary code for RELiZORB, effective July 1, 2018.[17]  But the agency encumbered this temporary code with two indicators that rendered it "not valid for Medicare claims processing purposes."  Specifically, the temporary code was encumbered with the coverage indicator "I," which means "not payable" by Medicare, as well as the pricing indicator "00," meaning "not separately priced by Part B (*e.g.*, services not covered,

---

[17]    HCPCS    Quarterly    Update,    Other    Codes    Effective    July    1,    2018, http://web.archive.org/web/20210415233903/https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/HCPCS-Quarterly-Update (last visited Sept. 9, 2025).

bundled, used by [Medicare] Part A only, etc.)"[18]  Under this temporary code, RELiZORB claims continued to be automatically and categorically rejected as duplicative, with no appeal rights, and Medicare and Medicaid still provided no reimbursement for RELiZORB.

57.    In June 2018, the district court denied Plaintiffs' preliminary injunction motion. *Alcresta*, 318 F. Supp. 3d at 328.  The court accepted that the beneficiary's health was suffering due to his inability to procure RELiZORB.  But it held that, "unfortunately for him, this lawsuit cannot be his means to" obtain relief.  The court concluded (incorrectly) that the beneficiary could challenge the lack of reimbursement through administrative remedies.

2.  *Court of Appeals Order and Administrative Response*

58.    Plaintiffs appealed and moved for expedited briefing and an emergency injunction pending appeal.  On July 13, 2018, the Court of Appeals granted the motion for injunction in part, ordering the Secretary "to issue a temporary billing code for Relizorb that is not encumbered with the Medicare-coverage indicator, pending further order of the court."  Per Curiam Order, *Alcresta Therapeutics, Inc. v. Azar*, No. 18-5192 (D.C. Cir. July 13, 2018), Dkt. No. 1740534 at 1; *see also Alcresta*, 755 F. App'x at 3.  Rather than issuing a new and unencumbered temporary code, the agency simply changed the indicators on RELiZORB's temporary code.  *Alcresta*, 755 F. App'x at 3.  CMS swapped the indicator that treated RELiZORB as "not payable" with one guaranteeing that all claims for RELiZORB would be treated as duplicate claims, and would remain unpayable. *Id.*  CMS retained the indicator that RELiZORB was not separately priced under Medicare Part B. Technical Direction Letter ("TDL") 180457 at 1-2 (July 20, 2018), Manual, ch. 20, § 30.7.2.

---

[18] Centers for Medicare & Medicaid Services, *Annual Update of HCPCS Codes Used for Skilled Nursing Facility Consolidated Billing Enforcement, Updated SNF Help File* 13 (Nov. 8, 2002), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/A02118.pdf; *see also Alcresta Therapeutics, Inc. v. Azar*, 755 F. App'x 1, 3 (D.C. Cir. 2018).

59.     Plaintiffs then moved the Court of Appeals to enforce the July 13 Order on the ground that the agency's implementation of that Order, due to the encumbering indicators, still did not enable Medicare claims processing or appeal rights under the applicable Medicare rules for new products.   On July 27, 2018, the Court denied the motion based on the government's representations that the new temporary billing code for RELiZORB "permits claims processing and results in an appealable, initial determination."  Per Curiam Order, *Alcresta Therapeutics, Inc. v. Azar*, No. 18-5192 (D.C. Cir. July 27, 2018), Dkt. No. 1742817 at 1.

60.     On November 5, 2018, HHS published its 2019 annual update to the HCPCS codes, in which the agency converted the temporary RELiZORB billing code to a permanent code grouped with other supplies for enteral and parenteral feeding.[19]  *See* Letter from former Secretary Alex Azar to Mark Langer, *Alcresta Therapeutics, Inc. v. Azar*, No. 18-5192 (D.C. Cir. Nov. 6, 2018), Dkt. No. 1758935.   In December 2018, the D.C. Circuit ruled on the pending appeal, granting Plaintiffs' preliminary injunction in part, concluding that Alcresta and the beneficiary demonstrated that they would otherwise face "irreparable harm."  *Alcresta*, 755 F. App'x at 2, 6. The Court explained that RELiZORB benefits seriously ill cystic fibrosis patients, and that Alcresta is "highly unlikely" to recoup "lost revenues" and "likely" to cease operations without adequate reimbursement.  *See id.* at 5 (citation omitted).  The Court ordered the agency to "assign Relizorb a temporary billing code that is not encumbered by Medicare coverage indicators that treat Relizorb as a component of the enteral feeding supply kit (coded as B4035) not separately priced or payable."  *Id.* at 2.  The Court explicitly acknowledged that "[c]oding and pricing may

---

[19] Centers for Medicare & Medicaid Services, *Annual Update of HCPCS Codes Used for Skilled Nursing Facility Consolidated Billing Enforcement, Updated SNF Help File* (Nov. 8, 2002), https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/A02118.pdf.

well be two separate processes," but "[h]ere, Relizorb's encumbered code acts as an absolute barrier to meaningful reimbursement." *Id.* at 4-5.

61.    CMS finally issued RELiZORB a separate HCPCS code on December 3, 2018.  The agency changed the Medicare coverage indicator for RELiZORB's temporary code to reflect that claims were payable by Medicare Part B, subject to "Contractor Discretion," removed the "Not Separately Priced" pricing indicator, added an indicator for "Parenteral and Enteral Nutrition," and then assigned these same indicators to a new, separate code for RELiZORB, which took effect January 1, 2019.[20]

62.    Because RELiZORB was then considered a newly coded product that was not yet on the national fee schedule for enteral nutrition therapy, on December 20, 2018, CMS issued a TDL to Medicare contractors on processing claims for RELiZORB, which directs the contractors to calculate the fee schedule amount for Q9994 (the temporary HCPCS code for RELiZORB) and B4105 (the HCPCS code for RELiZORB) "in accordance with the gap-filling methodology in section 60.3 of Chapter 23 of the Medicare Claims Processing Manual."  TDL 190132 at 2 (Dec. 20, 2018).

63.    Thus, the legal framework is clear: it is the contractors at their discretion—not CMS through a top-down directive—that must determine the appropriate reimbursement amount for

---

[20] *See HCPCS Code B4105*, HCPCS Codes, https://hcpcs.codes/b-codes/B4105/ (last visited Sept. 9, 2025) (HCPCS B4105 RELiZORB code identified as Parenteral and Enteral Nutrition); *2019 Corrections to the Alpha-Numeric HCPCS File*, Centers for Medicare & Medicaid Services, https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS-Items/2019-Corrections-to-Alpha-Numeric-HCPCS-File (last visited Sept. 9, 2025); Press Release, Alcresta Therapeutics, Inc., Alcresta Therapeutics Announces that RELiZORB® iMMOBILIZED LIPASE CARTRIDGE has been Issued a Permanent Medicare Billing Code (B4105) by the Centers for Medicare and Medicaid Services (CMS) (Dec. 27, 2018), https://web.archive.org/web/20210516123637/http://www.alcresta.com/news/alcresta-therapeutics-announces-relizorb%C2%AE-immobilized-lipase-cartridge-has-been-issued.

RELiZORB claims by applying the gap-filling methodology established in the Medicare Claims Processing Manual.  *See* 42 U.S.C. § 1395kk-1(a)(4)(A) (contractor determines payment amount); *see also* 42 C.F.R. § 405.904(a)(2) ("The Medicare contractor makes an initial determination when a claim for Medicare benefits … is submitted"); *id.* § 405.920(b) (contractor "must" "[d]etermine any amounts payable for claims); *id.* § 421.100(a)(1) (contractors "[d]etermin[e] the amount of payments to be made" on claims); Manual, ch. 23, § 80.1 (contactor "also determines if the charge for the specific item or service is inherently reasonable"); *id.* § 80.8 (contractor "exercise[s] judgment so that its reasonable charge determinations are realistic and equitable").

### 3. *Prior Reimbursement Litigation in the District Court*

64.    Despite this clear official instruction from CMS, agency contractors continue to underpay for RELiZORB.  Instead of properly exercising discretion to determine payment pursuant to the gap-filling methodology, the contractors are systematically underpaying for RELiZORB by using a $49 per cartridge starting point ordered by a top-down CMS command. The resulting underpayment threatens Medicare beneficiaries' access to the product.  Beneficiaries have filed hundreds of administrative appeals challenging the contractors' reimbursement determinations.  Currently, there are approximately 620 pending or soon-to-be-filed appeals, comprising claims brought by approximately 140 Medicare patients—over 155 of which are pending before the Council and approximately 70 of which are pending before an ALJ.  Hundreds more appeals are anticipated as current and future patients obtain monthly refills to manage life-long conditions.  Beneficiaries with severe illnesses have had to wait years for decisions, and tragically, 89 beneficiaries have already passed away during this years-long wait for claims and appeals to be processed.

65.     Thus, Plaintiff Alcresta and another beneficiary named James Henry previously filed two separate actions in this Court in 2020 and 2021 to challenge the agency's reimbursement determinations for his treatment with RELiZORB.  *See Henry v. Azar*, No. 1:20-cv-01144-CKK (D.D.C. 2020) [hereinafter *Henry I*]; *Henry II*, *supra* ¶ 35.  The 2021 action remains pending in this Court, while the Plaintiffs' motion for reconsideration of a dismissal on procedural grounds of the 2020 *Henry I* case is deferred until this Court decides the 2021 *Henry II* case.  Order, *Henry I*, Dkt. No. 27.

66.     In the first action, despite arguing that its contractors had properly calculated the gap-filled payment amount for RELiZORB, government counsel acknowledged that CMS had directed its contractors to use a purported "MSRP" figure from Alcresta's January 2017 HCPCS coding application for RELiZORB as the basis for its gap-filled payment determination.  *See* Mem. in Supp. of Def.'s Mot. to Dismiss and Remand, *Henry I*, Dkt. No. 13-1 at 7, 27 ("Gov't Mot. to Dismiss").  While Alcresta had indicated that its 2017 "MSRP" was $49, it later explained to the agency that this figure represented the supplier's wholesale acquisition cost for RELiZORB at that time.  Additionally, in the HCPCS code application Alcresta submitted the preceding year, it described the same $49 "MSRP" figure as its "wholesale acquisition cost"—the standard price at which Alcresta sold RELiZORB to suppliers at the time.  Information Supporting Coding Modification Recommendation (Revised Sept. 2015), Ex. 1 to Plaintiffs' Motion for Summary Judgment, *Henry I*, Dkt. No. 8-2 at 10.  The use of this supposed "MSRP" figure also fails to account for the fact that RELiZORB's wholesale price has changed over time in light of both inflation and new data that Alcresta has developed on the safety and efficacy of the product.

67.     The Court never reached the merits in *Henry I*, focusing principally on an administrative procedural error claimed by the agency as a basis for voluntary remand.  On

February 8, 2021, the Court issued its Order and Opinion dismissing that case without prejudice for lack of subject-matter jurisdiction, denying Plaintiffs' motion for summary judgment, and granting the Defendant's motion to dismiss.  *See* Order and Opinion, *Henry I*, Dkt. Nos. 22, 23.

68.    In March 2021, the Plaintiffs requested reconsideration of that dismissal.  Mot. for Reconsideration, *Henry I*, Dkt. No. 24.

69.    That same month, while the motion for reconsideration was pending in *Henry I*, the same Plaintiffs filed *Henry II*.  The *Henry II* plaintiffs are challenging the contractor's same underpayment for RELiZORB for a different claim for a different date of service.

70.    In October 2021, the parties in *Henry II* completed briefing on cross-motions for summary judgment.  *Id.* at 2.  That same month, this Court stayed *Henry I* and its decision on the Plaintiffs' motion for reconsideration "pending a resolution of the cross-motions for summary judgment in *Henry II*."  *Id.*

71.    On September 9, 2025, another group of beneficiaries, together with Alcresta, filed a new action raising substantially the same claims as *Henry II*.  *See* Compl., *Goetter v. Kennedy*, 1:25-cv-3100 (D.D.C. Sept. 9, 2025).  One of the beneficiaries in the present action, Athena Goetter, is also a plaintiff in *Goetter v. Kennedy*, where she challenges CMS's underpayment for RELiZORB based on the same grounds, but for a different date of service (January 5, 2022).

72.    Following a Joint Status Report, on September 29, 2025, the Court in *Goetter* ordered expedited summary judgment motions incorporating by reference the *Henry II* briefs as well as short supplemental briefs.  That supplemental briefing will occur once the lapse in appropriations ends.

**D.    Procedural History of Underlying Medicare Determinations**

1.    *Claims Determinations and Appeal Process*

73.    The procedural histories underlying these claims mirror those of the claims at issue in *Goetter v. Kennedy*, 1:25-cv-3100 (D.D.C. Sept. 9, 2025).  As in *Goetter*, every beneficiary in this case sought adequate reimbursement for RELiZORB used to break down fats in supplemental enteral formula and prescribed by their physicians to help them address severe ailments.  And, as in *Goetter*, the relevant facts underlying every claim are the same.  For every plaintiff beneficiary's date of service, the product was grossly underpaid because CMS improperly directed the use of $49 as the starting figure for the gap-filling calculations.[21]  Every beneficiary exhausted the four-level administrative review process to challenge these gross underpayments, first seeking a redetermination by the MAC, then a reconsideration by the QIC, then filing a request for an ALJ hearing, and finally a request for review before the Medicare Appeals Council.  And, at the conclusion of this administrative appeals process, every beneficiary received an unfavorable decision from the Medicare Appeals Council.  In each case, the Council upheld the unlawful underpayment despite recognizing what the beneficiaries argued all along: that the contractors used the wrong starting point for purposes of calculating the gap-filled payment amount, and that this error resulted in an unsustainably low reimbursement level that threatens access to RELiZORB because it is less than a supplier's acquisition cost.  The specific procedural history of each claim is detailed below (ordered chronologically by the beneficiary's first date of service).

---

[21] The precise aggregate amount of CMS's reimbursement varies marginally from case to case due to the number of boxes of RELiZORB prescribed and local pricing adjustments reflected in the reimbursement calculation.  *See supra* ¶ 22.

*a. Angelica Gallegos*

74.     As relevant to this case, on behalf of Ms. Gallegos, the Medicare supplier Option Care Enterprises I ("Option Care") submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on May 4, 2021.  The claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $22,680.00 ($378.00 per cartridge).  Through a remittance notice dated March 25, 2022, the DME MAC contractor, CGS Administrators, LLC (Jurisdiction C), paid only $2,028.96 for two boxes of RELiZORB ($33.82 per cartridge).

75.     A redetermination request challenging CGS' incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on June 23, 2022.  *See* 42 U.S.C. § 1395ff(b)(1)(A); *see also* 42 C.F.R. § 405.942(a).  At the first-level redetermination appeal stage, by letter dated August 9, 2022, CGS upheld its initial determination.  Letter from CGS Administrators, LLC, DME MAC Jurisdiction C, to Stephanie Webster on behalf of A. Gallegos re: Paid Claim Appeal Decision, Claim No. 22070757728000, at 1-2, Aug. 9, 2022.  Ms. Gallegos then requested QIC reconsideration by MAXIMUS Federal Services, the second-level Medicare appeal contractor, of the redetermination decision.  *See* 42 U.S.C. § 1395ff(c); *see also* 42 C.F.R. § 405.962(a).  On February 6, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of A. Gallegos re: Medicare Appeal No. 1-12187392824, at 1 (Feb. 6, 2023).  On March 29, 2023, Ms. Gallegos timely filed a request for an ALJ hearing, which is the third level of appeal.  *See* 42 U.S.C. § 1395ff(d)(1) (establishing right to ALJ review).  On May 15, 2023, the ALJ dismissed Ms. Gallegos' appeal.  Decision at 1, OMHA-152, Appeal No. 3-12187392824 (May 15, 2023). The ALJ concluded Ms. Gallegos' claim was "not an initial determination that is subject to

appeal." *Id.* at 4.   On June 22, 2023, Ms. Gallegos properly requested review of the ALJ's jurisdictional dismissal by the Medicare Appeals Council, the fourth level of appeal, under 42 U.S.C. § 1395ff(d)(2) and 42 C.F.R. § 405.1106(a).   The Council vacated the ALJ's jurisdictional ruling and remanded the case for a ruling on the merits, and on remand, on January 8, 2024, the ALJ issued an unfavorable decision rejecting Ms. Gallegos' appeal.   Decision at 1, OMHA-152, Appeal No. 3-12187392824Al (Jan. 8, 2024); *see also* Notice of Decision of Medicare Appeals Council, Docket No. M-23-6843 (Nov. 3, 2023).

76.     On March 4, 2024, Ms. Gallegos properly requested review of the unfavorable ALJ decision by the Medicare Appeals Council.   On September 12, 2025, the Council notified the beneficiary of its unfavorable decision.   Notice of Decision of Medicare Appeals Council, Docket No. M-24-2179 (Sept. 12, 2025); *see supra* ¶ 73 (describing Council decisions).

*b. Collene Travers*

77.     As relevant to this case, on behalf of Ms. Travers, the Medicare supplier Option Care submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on September 2, 2021, and December 23, 2021.   Both claims sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $22,680.00 ($378 per cartridge).   Through two remittance notices dated July 5, 2022, and July 1, 2022, for the September 2, 2021, and December 23, 2021, dates of service, the DME MAC contractor, Noridian Healthcare Solutions, LLC (Jurisdiction D), paid only $2,028.96 for two boxes of RELiZORB ($33.82 per cartridge) for each claim.

78.     Separate redetermination requests challenging both of Noridian's incorrect reimbursement determinations, which did not reflect proper application of the required gap-filling methodology, were timely filed on October 12, 2022.   At the first-level redetermination appeal stage, by letters dated November 21, 2022, Noridian upheld its initial determinations.   Letter from

Noridian Healthcare Solutions, LLC-JD to Stephanie Webster on behalf of C. Travers re: Paid Claim Appeal Decision, Doc. Control No. 22287000299, at 1 (Nov. 21, 2022); Letter from Noridian Healthcare Solutions, LLC-JD to Stephanie Webster on behalf of C. Travers re: Paid Claim Appeal Decision, Doc. Control No. 22287000301, at 1 (Nov. 21, 2022). Ms. Travers then requested QIC reconsideration by MAXIMUS Federal Services. On June 19, 2023, MAXIMUS issued unfavorable decisions for the claims. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of C. Travers re: Medicare Appeal No. 1-12929236221, at 5-6 (June 19, 2023); Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of C. Travers re: Medicare Appeal No. 1-12923193383, at 5-6 (June 19, 2023) (including identical language). On August 15, 2023, Ms. Travers timely filed requests for ALJ hearings. On November 2 and November 3, 2023, the ALJ issued her unfavorable decisions rejecting additional payment for RELiZORB for the September 2, 2021, and December 23, 2021, dates of service, respectively. Decision at 1, OMHA-152, Appeal No. 3-12929236221 (Nov. 2, 2023); Decision at 1, OMHA-152, Appeal No. 3-12923193383 (Nov. 3, 2023).

79.    On December 13, 2023, Ms. Travers properly requested review by the Medicare Appeals Council. On September 11, 2025, the Council notified the beneficiary of its unfavorable decision related to her September 2, 2021, date of service. Notice of Decision of Medicare Appeals Council, Docket No. M-24-970 (Sept. 11, 2025); *see supra* ¶ 73. On October 16, 2025, the Council notified the beneficiary of its unfavorable decision related to her December 23, 2021, date of service. Notice of Decision of Medicare Appeals Council, Docket No. M-24-971 (Oct. 16, 2025); *see supra* ¶ 73.

*c. Jessica Granger*

<u>September 24, 2021, Date of Service</u>

80.      As relevant to this case, on behalf of Ms. Granger, the Medicare supplier Option Care submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on September 24, 2021.  The claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $22,680.00 ($378 per cartridge).  Through a remittance notice dated August 15, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $2,028.96 for two boxes of RELiZORB ($33.82 per cartridge).

81.      A redetermination request challenging Noridian's incorrect reimbursement determinations, which did not reflect proper application of the required gap-filling methodology, was timely filed on November 14, 2022.  At the first-level redetermination appeal stage, by letter dated December 29, 2022, Noridian upheld its initial determinations.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Jessica Granger re: Paid Claim Appeal Decision, Doc. Control No. 22320010320, at 1 (Dec. 29, 2022).  Ms. Granger then requested QIC reconsideration by MAXIMUS Federal Services.  On July 20, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of J. Granger re: Medicare Appeal No. 1-13012641515, at 5 (July 20, 2023).  On September 7, 2023, Ms. Granger timely filed a request for an ALJ hearing.  On November 27, 2023, the ALJ issued his unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-13012641515 (Nov. 27, 2023).

82.      On January 25, 2024, Ms. Granger properly requested review by the Medicare Appeals Council.  On October 9, 2025, the Council notified the beneficiary of its unfavorable

34

decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-24-1599 (Oct. 9, 2025); *see supra* ¶ 73.

### October 1, 2022, Date of Service

83.    As relevant to this case, on behalf of Ms. Granger, the Medicare supplier Option Care submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on October 1, 2022.  The claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $24,721.20 ($412.02 per cartridge).  Through a remittance notice dated November 30, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $2,089.99 for two boxes of RELiZORB ($34.83 per cartridge).

84.    A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect a proper application of the required gap-filling methodology, was timely filed on March 10, 2023.  At the first-level redetermination appeal stage, by letter dated April 20, 2023, Noridian upheld its initial determination.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Jessica Granger re: Paid Claim Appeal Decision, Doc. Control No. 23072010385, at 1 (Apr. 20, 2023).  Ms. Granger then requested QIC reconsideration by MAXIMUS Federal Services.  On November 30, 2023, MAXIMUS issued an unfavorable decision.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of J. Granger re: Medicare Appeal No. 1-13356122990, at 5 (Nov. 20, 2023).  On December 20, 2023, Ms. Granger timely filed a request for an ALJ hearing.  On March 1, 2024, the ALJ issued his unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-13356122990 (Mar. 1, 2024).

85.    On April 12, 2024, Ms. Granger properly requested review by the Medicare Appeals Council.  On September 18, 2025, the Council notified the beneficiary of its unfavorable

decision. Notice of Decision of Medicare Appeals Council, Docket No. M-24-2623 (Sept. 18, 2025); *see supra* ¶ 73.

    *d. Athena Goetter*

*October 2, 2021, Date of Service*

86.    As relevant to this case, on behalf of Ms. Goetter, the Medicare supplier Bioscrip Infusion Services, LLC ("Bioscrip") submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on October 2, 2021. The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of $11,340.00 ($378.00 per cartridge). Through a remittance notice dated July 6, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $1,014.48 for one box of RELiZORB ($33.82 per cartridge).

87.    A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on September 29, 2022. At the first-level redetermination appeal stage, by letter dated November 3, 2022, Noridian upheld its initial determination. Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Bioscrip on behalf of A. Goetter re: Paid Claim Appeal Decision, Doc. Control No. 22276010396, at 1 (Nov. 3, 2022). Ms. Goetter then requested QIC reconsideration by MAXIMUS Federal Services. On May 25, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of A. Goetter re: Medicare Appeal No. 1-12802906023, at 3-4 (May 25, 2023). On July 14, 2023, Ms. Goetter timely filed a request for an ALJ hearing. On October 10, 2023, the ALJ issued her unfavorable decision rejecting additional payment for RELiZORB. Decision at 1, OMHA-152, Appeal No. 3-12802906023 (Oct. 10, 2023).

88.     On November 29, 2023, Ms. Goetter properly requested review by the Medicare Appeals Council.  On September 12, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-24-730 (Sept. 12, 2025); *see supra* ¶ 73.

### *February 7, 2022, Date of Service*

89.     As relevant to this case, on behalf of Ms. Goetter, Bioscrip submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on February 7, 2022.  The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of \$12,360.60 (\$412.02 per cartridge).  Through a remittance notice dated July 11, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only \$1,066.32 for one box of RELiZORB (\$35.54 per cartridge).

90.     A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on September 29, 2022.  At the first-level redetermination appeal stage, by letter dated November 3, 2022, Noridian upheld its initial determination.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Bioscrip on behalf of A. Goetter re: Paid Claim Appeal Decision, Doc. Control No. 22276010442, at 1 (Nov. 3, 2022).  Ms. Goetter then requested QIC reconsideration by MAXIMUS Federal Services.  On May 19, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of A. Goetter re: Medicare Appeal No. 1-12785773489, at 1 (May 19, 2023).  On July 14, 2023, Ms. Goetter timely filed a request for an ALJ hearing.  On October 10, 2023, the ALJ issued her unfavorable

decision rejecting additional payment for RELiZORB. Decision at 1, OMHA-152, Appeal No. 3-12785773489 (Oct. 10, 2023).

91.    On November 29, 2023, Ms. Goetter properly requested review by the Medicare Appeals Council. On October 2, 2025, the Council notified the beneficiary of its unfavorable decision. Notice of Decision of Medicare Appeals Council, Docket No. M-24-726 (Oct. 2, 2025); *see supra* ¶ 73.

### *March 4, 2022, Date of Service*

92.    As relevant to this case, on behalf of Ms. Goetter, Bioscrip submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on March 4, 2022. The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of $12,360.60 ($412.02 per cartridge). Through a remittance notice dated August 11, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $1,066.32 for one box of RELiZORB ($35.54 per cartridge).

93.    A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on September 29, 2022. At the first-level redetermination appeal stage, by letter dated November 3, 2022, Noridian upheld its initial determination. Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Bioscrip on behalf of A. Goetter re: Paid Claim Appeal Decision, Doc. Control No. 22276010397, at 1 (Nov. 3, 2022). Ms. Goetter then requested QIC reconsideration by MAXIMUS Federal Services. On May 25, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of A. Goetter re: Medicare Appeal No. 1-12798841031, at 1 (May 25, 2023). On July 14, 2023, Ms. Goetter

timely filed a request for an ALJ hearing.  On October 10, 2023, the ALJ issued her unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-12798841031 (Oct. 10, 2023).

94.    On November 29, 2023, Ms. Goetter properly requested review by the Medicare Appeals Council.  On October 16, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-24-727 (Oct. 16, 2025); *see supra* ¶ 73.

### *April 4, 2022, Date of Service*

95.    As relevant to this case, on behalf of Ms. Goetter, Bioscrip submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on April 4, 2022.  The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of $12,360.60 ($412.02 per cartridge).  Through a remittance notice dated July 7, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $1,055.66 for one box of RELiZORB ($35.19 per cartridge).

96.    A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on September 29, 2022.  At the first-level redetermination appeal stage, by letter dated November 3, 2022, Noridian upheld its initial determination.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Bioscrip on behalf of A. Goetter re: Paid Claim Appeal Decision, Doc. Control No. 22276010399, at 1 (Nov. 3, 2022).  Ms. Goetter then requested QIC reconsideration by MAXIMUS Federal Services.  On May 19, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of A. Goetter

re: Medicare Appeal No. 1-12783289335, at 1 (May 19, 2023).  On July 14, 2023, Ms. Goetter timely filed a request for an ALJ hearing.  On October 10, 2023, the ALJ issued her unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-12783289335 (Oct. 10, 2023).

97.     On November 29, 2023, Ms. Goetter properly requested review by the Medicare Appeals Council.  On October 6, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-24-728 (Oct. 6, 2025); *see supra* ¶ 73.

*July 3, 2022, Date of Service*

98.     As relevant to this case, on behalf of Ms. Goetter, Bioscrip submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on July 3, 2022.  The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of $12,360.60 ($412.02 per cartridge).  Through a remittance notice dated July 21, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $1,044.99 for one box of RELiZORB ($34.83 per cartridge).

99.     A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on September 29, 2022.  At the first-level redetermination appeal stage, by letter dated November 3, 2022, Noridian upheld its initial determination.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Bioscrip on behalf of A. Goetter re: Paid Claim Appeal Decision, Doc. Control No. 22276010393, at 1 (Nov. 3, 2022).  Ms. Goetter then requested QIC reconsideration by MAXIMUS Federal Services.  On May 26, 2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment.

Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of A. Goetter re: Medicare Appeal No. 1-12798201830, at 1 (May 26, 2023).  On July 14, 2023, Ms. Goetter timely filed a request for an ALJ hearing.  On October 10, 2023, the ALJ issued her unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-12798201830 (Oct. 10, 2023).

100.    On November 29, 2023, Ms. Goetter properly requested review by the Medicare Appeals Council.  On September 15, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-24-729 (Sept. 15, 2025); *see supra* ¶ 73.

*e. Hunter Cooke*

101.    As relevant to this case, on behalf of Mr. Cooke, Springville Pharmacy Infusion Therapy, Inc. ("Springville Pharmacy") submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on December 24, 2021.  This claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $22,680.00 ($378 per cartridge).  Through a remittance notice dated July 6, 2022, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $2,028.96 for two boxes of RELiZORB ($33.82 per cartridge) for this claim.

102.    A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on October 18, 2022.  At the first-level redetermination appeal stage, by letter dated November 23, 2022, Noridian upheld its initial determination.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to H. Cooke re: Paid Claim Appeal Decision, Doc. Control No. 22293010280, at 1 (Nov. 23, 2022).  Mr. Cooke then requested QIC reconsideration by MAXIMUS Federal Services of the redetermination decision.  On June 19,

41

2023, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment. Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of H. Cooke re: Medicare Appeal No. 1-12929553943, at 3-4 (June 19, 2023). On August 16, 2023, Mr. Cooke timely filed a request for an ALJ hearing. On November 14, 2023, the ALJ issued his unfavorable decision rejecting additional payment for RELiZORB. Decision at 1, OMHA-152, Appeal No. 3-12929553943 (Nov. 14, 2023).

103.    On January 12, 2024, Mr. Cooke properly requested review by the Medicare Appeals Council. On October 22, 2025, the Council notified the beneficiary of its unfavorable decision. Notice of Decision of Medicare Appeals Council, Docket No. M-24-1423 (Oct. 22, 2025); *see supra* ¶ 73.

*f. Dennis Baker*

104.    As relevant to this case, on behalf of Mr. Baker, Option Care submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on November 26, 2022. This claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $24,721.20 ($412.02 per cartridge). Through a remittance notice dated January 4, 2023, the DME MAC contractor, Noridian Healthcare Solutions, LLC (Jurisdiction D), paid only $2,089.99 for two boxes of RELiZORB ($34.83 per cartridge) for this claim.

105.    A redetermination request challenging Noridian's incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on April 28, 2023. At the first-level redetermination appeal stage, by letter dated June 19, 2023, Noridian upheld its initial determination. Letter from Noridian Healthcare Solutions, LLC, DME MAC Jurisdiction D to Option Care on behalf of D. Baker re: Paid Claim Appeal Decision, Doc. Control No. 23121000346, at 1 (June 19, 2023). Mr. Baker then requested QIC reconsideration by MAXIMUS Federal Services of the redetermination decision. On January

3, 2024, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of D. Baker re: Medicare Appeal No. 1-13528257609, at 3-4 (January 3, 2024).  On February 23, 2024, Mr. Baker timely filed a request for an ALJ hearing.  On April 9, 2024, the ALJ issued his unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-13528257609 (Apr. 9, 2024).

106.    On May 23, 2024, Mr. Baker properly requested review by the Medicare Appeals Council.  On October 22, 2025, the Council notified the beneficiary of its unfavorable decision. Notice of Decision of Medicare Appeals Council, Docket No. M-24-3143 (Oct. 22, 2025); *see supra* ¶ 73.

### g. Hector Bermudez

107.    As relevant to this case, on behalf of Mr. Bermudez, Trinity Homecare, LLC submitted Medicare claims—using the new code CMS issued—for RELiZORB furnished on December 2, 2022, and December 31, 2022.  Each claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $24,721.20 ($412.02 per cartridge).  Through two remittance notices dated February 3, 2023, and February 6, 2023, the DME MAC contractor, Noridian Healthcare Solutions, LLC-JA (Jurisdiction A), paid only $2,089.99 for two boxes of RELiZORB ($34.83 per cartridge) for each claim.

108.    Separate redetermination requests challenging both of Noridian's incorrect reimbursement determinations, which did not reflect proper application of the required gap-filling methodology, were timely filed on May 24, 2023.  At the first-level redetermination appeal stage, by letters dated July 18, 2023, Noridian upheld its initial determinations.  Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Stephanie Webster on behalf of H. Bermudez re: Paid Claim Appeal Decision, Doc. Control No. 23146010251, at 1 (July 18, 2023);

Letter from Noridian Healthcare Solutions, LLC-JA, DME MAC Jurisdiction A to Trinity Homecare on behalf of H. Bermudez re: Paid Claim Appeal Decision, Doc. Control No. 23146010250, at 1 (July 18, 2023).  Mr. Bermudez then requested QIC reconsideration by MAXIMUS Federal Services of the redetermination decisions.  On January 17, 2024, MAXIMUS issued two unfavorable decisions for the claims.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of H. Bermudez re: Medicare Appeal No. 1-13581241646, at 3-4 (Jan. 17, 2024); Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of H. Bermudez re: Medicare Appeal No. 1-13581241012, at 3-4 (Jan. 17, 2024).  On March 1, 2024, Mr. Bermudez timely filed two requests for ALJ hearings.  On June 21, 2024, the ALJ issued her unfavorable decisions rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-13581241012 (June 21, 2024); Decision at 1, OMHA-152, Appeal No. 3-13581241646 (June 21, 2024).

109.    On August 8, 2024, Mr. Bermudez properly requested review by the Medicare Appeals Council.  On September 5, 2025, and September 8, 2025, the Council notified the beneficiary of its unfavorable decisions.  Notice of Decision of Medicare Appeals Council, Docket No. M-24-4052 (Sept. 5, 2025); Notice of Decision of Medicare Appeals Council, Docket No. M-24-4051 (Sept. 8, 2025); *see supra* ¶ 73.

*h. Thomas Burton*

110.    As relevant to this case, on behalf of Mr. Burton, Option Care submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on June 28, 2023.  The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of $14,585.40 ($486.18 per cartridge).  Through a remittance notice dated July 17, 2023, the DME MAC contractor, CGS Administrators, LLC (Jurisdiction B) ("CGS"), paid only $1,193.17 for one box of RELiZORB ($39.77 per cartridge).

111.    A    redetermination    request    challenging    CGS'    incorrect    reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on November 8, 2023.  At the first-level redetermination appeal stage, by letter dated December 18, 2023, CGS upheld its initial determination.  Letter from CGS Administrators, LLC, DME MAC Jurisdiction B to Stephanie Webster on behalf of T. Burton re: Paid Claim Appeal Decision, Doc. Control No. 23314000565, at 6 (Dec. 18, 2023).  Mr. Burton then requested QIC reconsideration by MAXIMUS Federal Services.  On May 31, 2024, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of T. Burton re: Medicare Appeal No. 1-14047687670, at 3-4 (May 31, 2024).  On July 9, 2024, Mr. Burton timely filed a request for an ALJ hearing.  On September 24, 2024, the ALJ issued her unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-14078422635 (Sept. 24, 2024).

112.    On October 14, 2024, Mr. Burton properly requested review by the Medicare Appeals Council.  On October 3, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-25-113 (Oct. 3, 2025); *see supra* ¶ 73.

*i. Michael Curless*

113.    As relevant to this case, on behalf of Mr. Curless, Clinical Specialties, Inc. submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on September 11, 2023.  The claim sought reimbursement based on the reasonable charges for one box of RELiZORB, or 30 cartridges, of $14,585.40 ($486.18 per cartridge).  Through a remittance notice dated September 27, 2023, the DME MAC contractor, CGS Administrators, LLC (Jurisdiction B), paid only $1,136.02 for one box of RELiZORB ($37.87 per cartridge).

114.    A redetermination request challenging CGS' incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on January 3, 2024.  At the first-level redetermination appeal stage, by letter dated February 2, 2024, CGS upheld its initial determination.  Letter from CGS Administrators, LLC, DME MAC Jurisdiction B to Stephanie Webster on behalf of M. Curless re: Paid Claim Appeal Decision, Doc. Control No. 23256855886000, at 6 (Feb. 2, 2024).  Mr. Curless then requested QIC reconsideration by MAXIMUS Federal Services.  On August 2, 2024, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf of M. Curless re: Medicare Appeal No. 1-14252795403, at 3-4 (Aug. 2, 2024).  On September 17, 2024, Mr. Curless timely filed a request for an ALJ hearing.  On December 10, 2024, the ALJ issued her unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-14252795403 (Dec. 10, 2024).

115.    On January 30, 2025, Mr. Curless properly requested review by the Medicare Appeals Council.  On October 3, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-25-1092 (Oct. 3, 2025); *see supra* ¶ 73.

*j. Joseph Sladky*

116.    As relevant to this case, on behalf of Mr. Sladky, Option Care submitted a Medicare claim—using the new code CMS issued—for RELiZORB furnished on November 23, 2023.  This claim sought reimbursement based on the reasonable charges for two boxes of RELiZORB, or 60 cartridges, of $29,170.80 ($486.18 per cartridge).  Through a remittance notice dated December 12, 2023, the DME MAC contractor, CGS Administrators, LLC (Jurisdiction C), paid only $2,339.30 for two boxes of RELiZORB ($38.99 per cartridge).

117.   A redetermination request challenging CGS' incorrect reimbursement determination, which did not reflect proper application of the required gap-filling methodology, was timely filed on March 13, 2024.  At the first-level redetermination appeal stage, by letter dated April 15, 2024, CGS upheld its initial determination.  Letter from CGS Administrators, LLC, DME MAC Jurisdiction C to Stephanie Webster on behalf of J. Sladky re: Paid Claim Appeal Decision, Doc. Control No. 24075000462, at 6 (April 15, 2024).   Mr. Sladky then requested QIC reconsideration by MAXIMUS Federal Services.  On October 15, 2024, MAXIMUS issued an unfavorable decision for the claim upholding the MAC's underpayment.  Letter from MAXIMUS Federal Services, DME QIC to Stephanie Webster on behalf J. Sladky re: Medicare Appeal No. 1-14560950739 (Oct. 15, 2024).  On November 22, 2024, Mr. Sladky timely filed a request for an ALJ hearing.  On February 19, 2025, the ALJ issued his unfavorable decision rejecting additional payment for RELiZORB.  Decision at 1, OMHA-152, Appeal No. 3-14560950739 (Feb. 19, 2025).

118.   On April 25, 2025, Mr. Sladky properly requested review by the Medicare Appeals Council.  On October 24, 2025, the Council notified the beneficiary of its unfavorable decision.  Notice of Decision of Medicare Appeals Council, Docket No. M-25-2163 (Oct. 24, 2025); *see supra* ¶ 73.

### 2. *Incorrect Application of the Gap-Filling Methodology*

119.   As explained above, the MACs were required to apply the agency's gap-filling rules to determine the payment on Plaintiffs' RELiZORB claims.  *See* 42 U.S.C. § 1395u(s) (administering Part B based on reasonable charges); *id.* § 1395m(a)(2)-(3), (8) (mandating that fee schedule amounts for durable medical equipment generally be based on average reasonable charges increased by annual covered item update factors); 42 C.F.R. § 414.102(a); 66 Fed. Reg. at 45,174; 72 Fed. Reg. at 18,050; Manual, ch. 23, §§ 60, 60.3.  Instead, the MACs used a figure dictated by CMS in violation of the Medicare rules governing the determination of the gap-filled

payment amount for RELiZORB and significantly underpaid Plaintiffs' claims, in direct contravention of the TDL's direction that the contractors perform the gap-filling calculation in accordance with Manual, ch. 23, § 60.3, which in turn requires the use of reasonable charges in gap-filling. TDL 190132 at 2.

120.    CMS directed the use of this $49 "MSRP" figure as the starting point in gap-filling the payment amount for RELiZORB claims, and emailed the DME MACs regarding the use of this figure. As revealed in documents produced by CMS under the Freedom of Information Act, CMS directed contractors to use the wrong starting point to determine the gap-filled fee schedule payment amount, in violation of the Medicare statute and related agency rules. *See* Notice, Exs. 1-2, *Henry II*, Dkt. No. 27-1 and 27-2 (in response to request from MAC to provide "the company's price that *you* used to get the gap-filled fee," CMS official provided fee calculation "based on . . . the suggested MSRP for RELiZORB" of $49); Mem. in Supp. of Def.'s Mot. to Dismiss & Remand at 27, *Henry I*, Dkt. No. 13-1 (explaining that "Medicare . . . chose the MSRP . . . in applying the gap-filling methodology"), *supra* ¶ 65; *see also* Council Decision at 2, Docket No. M-24-725 (Aug. 1, 2025) ("The gap-filled fee amount for the claim was calculated by using a 'retail price' of $49 per cartridge. . . ."); Council Decision at 2, Docket No. M-24-4190 (Sept. 5, 2025) (same); Council Decision at 2, Docket No. M-24-431 (Sept. 2, 2025) (same).

121.    The contractors thus incorrectly used a 2016 purported "MSRP" figure from the manufacturer's January 2017 application for a useable HCPCS medical code cost instead of price lists as reflected in charges to the payor. *See id.* Alcresta has documented, however, that this $49 "MSRP" on which the government relies was, in fact, the wholesale acquisition cost to suppliers in 2017, as the Council acknowledged, *id.* at 6, and has never been the retail price of RELiZORB.[22]

---

[22] *See* Plaintiffs' Reply in Support of Mot. for Summary Judgment, *Henry I*, Dkt. No. 17, at 7-8.

Additionally, this $49 amount was not even the wholesale acquisition price in effect at the time RELiZORB was later furnished to Plaintiffs' in 2021 and 2022.

122.    If the MACs had followed the gap-filling rules required by Medicare statutes and agency rules, as specifically required by TDL 190132 issued at the culmination of the coding litigation, it would have determined the proper fee schedule amounts based on the suppliers' charges for RELiZORB.  For all beneficiaries, the proper payment amount would be at least $260.90 per cartridge.

123.    As described above, the Manual explains that the gap-filling process requires updating the base year reasonable charges for an item to the current year's price by deflating current charges to the relevant base year, then updating that figure to reflect increases in the consumer price index over time.  *See supra* ¶¶ 22, 119 (citing, *e.g.*, Manual, ch. 23, §§ 60, 60.3; 42 C.F.R. § 414.102(a) (requiring payment of 80 percent of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service")).  The gap-filled fee schedule amount for RELiZORB thus should be calculated based on reasonable charges by the supplier at the time the product is furnished.  *See supra* ¶ 17 (citing Medicare rules requiring calculation of reasonable charges, *e.g.*, 42 U.S.C. §§ 1395u(s), 1395m(a)(2)-(3), (8); Pub. L. No. 105-33 § 4551(b); 83 Fed. Reg. at 57,046).

124.    For purposes of deriving payment for DMEPOS, "reasonable charge determinations are generally based on customary and prevailing charges derived from historic charge data." 72 Fed. Reg. 17,992, 17,994 (Apr. 10, 2007).  According to the Manual, to determine customary charges, Medicare contractors are required to use, "to the extent possible, the actual charges for services rendered during the year ending June 30 immediately preceding the start of the fee screen year."  Manual, ch. 23, § 80.3.l.

125.    But the Manual calls for the use of other data for "new services," *id.* § 80.2, and provides that "[c]ustomary charges may be established using price lists" of the supplier "when there is inadequate charge data," *id.* § 80.3.1.  *See also id.* § 60.3 (discussing use of "supplier price lists" in gap-filling).  In calling for the use of "supplier prices lists," the Manual explains that sources that "provide information on commercial pricing" are appropriate, which is distinct from any item's wholesale price.  *See* Manual, ch. 23, § 60.3; *see also* 84 Fed. Reg. at 60,740 (distinguishing supplier list prices from actual retail prices, which include "all costs associated with furnishing items directly to the customer").  "In this case, use only the fees charged and the price lists in effect as of December 31 of the data base year."  Manual § 80.3.1.  The Manual separately provides that "[i]f it is necessary to establish customary charges using price lists, A/B MACs (B)/DME MACs use these customary charges to also establish the required prevailing charges. (*See* § 80.3.1.)."  *Id.* § 80.4.  So, to determine both customary and prevailing charges, the DME MAC should look at the supplier's charges as of December 31 of the base year designated by CMS.

126.    The base year for enteral nutrition items on the fee schedule is 1995.  RELiZORB did not exist at that time and did not even receive a separate HCPCS code until December 2018.[23] The reasonable price charged by the supplier for RELiZORB reflected in the record for these claims should therefore be the starting point for a gap-filling calculation.

127.    Because all of the MACs erroneously used the $49 figure as the starting point rather than the reasonable price charged by the supplier, the MACs grossly under reimbursed every beneficiary in this case—just like in *Goetter v. Kennedy*.  Although the proper aggregate

---

[23] *See 2019 Corrections to the Alpha-Numeric HCPCS File*, *supra* note 20 (HCPCS code Q9994 effective December 3, 2018 (temporary RELiZORB code), and HCPCS code B4105 effective January 1, 2019); *HCPCS Code B4105*, *supra* note 20.

reimbursement amounts vary marginally for each beneficiary because of different quantities, different dates of service, and local price adjustments, all are dramatically higher than the paltry amount the contractors paid in each case.

### a. Angelica Gallegos

128.   The supplier of Ms. Gallegos is Option Care.  For her May 4, 2021, date of service, its list price for RELiZORB, reflected as the amount charged on the claim submitted for the product, was $22,680.00 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Ms. Gallegos' claim for RELiZORB should be calculated based on that list price.

129.   Data from other suppliers of RELiZORB also reflect that Option Care's price reflected in its charges was within the range of charges by other suppliers of the device.  Indeed, numerous plans, including Cigna HIT Comm ($448.14 per cartridge), BCBS PA HIT Comm Highmark ($425.50 per cartridge), and ChampVA N/C ($477.63 per cartridge), paid suppliers amounts higher than Option Care's charges to Medicare.  Medicare, on the other hand, paid only $2,028.96 (or $33.82 per cartridge) for a charge of $22,680.00 for two boxes ($378.00 per cartridge)—far below even the $49 per cartridge "MSRP" starting point, which was actually a several-years-old wholesale acquisition cost to suppliers.  *See supra* ¶ 66.

130.   For Ms. Gallegos' claim, applying the gap-filling methodology to this claim and deflating the list price for two boxes of RELiZORB of $22,680.00 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $14,356.44.  The product of the annual update factors is 1.363.  This means that applying the required annual updates to a starting price will yield a result that is 1.363 times the starting price.  Applying that cumulative factor to the deflated charges of $14,356.44, the gap-filled fee schedule amount would yield $19,567.83.

131.    Payment would thus be $15,654.26 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($260.90 per cartridge).   The contractor, however, reimbursed only $2,028.96 (or $33.82 per cartridge) for this claim.

*b. Collene Travers*

132.    The supplier of Ms. Travers is Option Care.   For her September 2, 2021, and December 31, 2021, dates of service, Option Care's list price for RELiZORB, reflected as the amount charged on each of the claims submitted for the product, was $22,680.00 for two boxes of 30 cartridges.   The gap-filled fee schedule amounts for Ms. Travers's claims for RELiZORB should be calculated based on that list price.

133.    Data from other suppliers of RELiZORB also reflect that Option Care's 2021 prices reflected in its charges were within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

134.    Applying the gap-filling methodology to these claims and deflating the list price for two boxes of RELiZORB of $22,680.00 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $14,356.44.   Applying the product of the annual update factors of 1.363 to the deflated charges of $14,356.44, the gap-filled fee schedule amount would yield $19,567.83.

135.    Payment for each claim would thus be $15,654.26 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($260.90 per cartridge).   The contractor, however, reimbursed only $2,028.96 (or $33.82 per cartridge) for each claim.

*c. Jessica Granger*

<u>September 24, 2021, Date of Service</u>

136.    The supplier of Ms. Granger is Option Care.   For her September 24, 2021, date of service, its list price for RELiZORB, reflected as the amount charged on the claim submitted for

the product, was $22,680.00 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Ms. Granger's claim for RELiZORB should be calculated based on those list prices.

137.    Data from other suppliers of RELiZORB also reflect that Option Care's 2021 price reflected in its charges was within the range of charges by other suppliers of the device. *See supra* ¶ 129.

138.    For Ms. Granger's 2021 claim, applying the gap-filling methodology to this claim and deflating the list price for two boxes of RELiZORB of $22,680.00 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $14,356.44.  Applying the product of the annual update factors of 1.363 to the deflated charges of $14,356.44, the gap-filled fee schedule amount would yield $19,567.83.

139.    Payment would thus be $15,654.26 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($260.90 per cartridge).   The contractor, however, reimbursed only $2,028.96 (or $33.82 per cartridge) for this claim.

<u>October 1, 2022, Date of Service</u>

140.    For Ms. Granger's October 1, 2022, date of service, Option Care's list price for RELiZORB, reflected as the amount charged on the claim submitted for the product, was $24,721.20 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Ms. Granger's claim for RELiZORB should be calculated based on those list prices.

141.    Data from other suppliers of RELiZORB also reflect that Option Care's 2022 price reflected in its charges was within the range of charges by other suppliers of the device. *See supra* ¶ 129.

142.    Applying the gap-filling methodology to this claim and deflating the list price for two boxes of RELiZORB of $24,721.20 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $15,648.52.  The product of the annual update factors is 1.432.  This

means that applying the required annual updates to a starting price will yield a result that is 1.432 times the starting price. Applying that cumulative factor to the deflated charges of $15,648.52, the gap-filled fee schedule amount would yield $22,408.68.

143. Payment would thus be $17,926.94 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($298.78 per cartridge). The contractor, however, reimbursed only $2,089.99 (or $34.83 per cartridge) for this claim.

*d. Athena Goetter*

<u>October 2, 2021, Date of Service</u>

144. The supplier of Ms. Goetter is Bioscrip. For her October 2, 2021, date of service, its list price for RELiZORB, reflected as the amount charged on each of the claims submitted for the product, was $11,340.00 for one box of 30 cartridges. The gap-filled fee schedule amount for Ms. Goetter's claim for RELiZORB for this date of service should be calculated based on that list price.

145. Data from other suppliers of RELiZORB also reflect that Bioscrip's 2021 prices reflected in its charges were within the range of charges by other suppliers of the device. *See supra* ¶ 129.

146. Applying the gap-filling methodology to these claims and deflating the list price for one box of RELiZORB of $11,340.00 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $7,178.22. Applying the product of the annual update factors of 1.363 to the deflated charges of $7,178.22, the gap-filled fee schedule amount would yield $9,783.91.

147. Payment for each claim would thus be $7,827.13 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($260.90 per cartridge). The contractor, however, reimbursed only $1,014.48 (or $33.82 per cartridge).

*February 7, 2022, Date of Service*

148.    For Ms. Goetter's February 7, 2022, date of service, Bioscrip's list price for RELiZORB, reflected as the amount charged on each of the claims submitted for the product, was $12,360.60 for one box of 30 cartridges.  The gap-filled fee schedule amount for Ms. Goetter's claim for RELiZORB for this date of service should be calculated based on that list price.

149.    Data from other suppliers of RELiZORB also reflect that Bioscrip's 2022 prices reflected in its charges were within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

150.    Applying the gap-filling methodology to these claims and deflating the list price for one box of RELiZORB of $12,360.60 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $7,824.26.  The product of the annual update factors is 1.432.  This means that applying the required annual updates to a starting price will yield a result that is 1.432 times the starting price.  Applying that cumulative factor to the deflated charges of $7,824.26, the gap-filled fee schedule amount would yield $11,204.34.

151.    Payment for each claim would thus be $8,963.47 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($298.78 per cartridge).  The contractor, however, reimbursed only $1,066.32 (or $35.54 per cartridge).

*March 4, 2022, Date of Service*

152.    For Ms. Goetter's March 4, 2022, date of service, Bioscrip's list price for RELiZORB, reflected as the amount charged on each of the claims submitted for the product, was $12,360.60 for one box of 30 cartridges.  The gap-filled fee schedule amount for Ms. Goetter's claim for RELiZORB for this date of service should be calculated based on that list price.

153.    Data from other suppliers of RELiZORB also reflect that Bioscrip's 2022 prices reflected in its charges were within the range of charges by other suppliers of the device. *See supra* ¶ 129.

154.    Applying the gap-filling methodology to these claims and deflating the list price for one box of RELiZORB of $12,360.60 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $7,824.26.  Applying the product of the annual update factors of 1.432 to the deflated charges of $7,824.26, the gap-filled fee schedule amount would yield $11,204.34.

155.    Payment for each claim would thus be $8,963.47 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($298.78 per cartridge).  The contractor, however, reimbursed only $1,066.32 (or $35.54 per cartridge).

### *April 4, 2022, Date of Service*

156.    For Ms. Goetter's April 4, 2022, date of service, Bioscrip's list price for RELiZORB, reflected as the amount charged on each of the claims submitted for the product, was $12,360.60 for one box of 30 cartridges.  The gap-filled fee schedule amount for Ms. Goetter's claim for RELiZORB for this date of service should be calculated based on that list price.

157.    Data from other suppliers of RELiZORB also reflect that Bioscrip's 2022 prices reflected in its charges were within the range of charges by other suppliers of the device. *See supra* ¶ 129.

158.    Applying the gap-filling methodology to these claims and deflating the list price for one box of RELiZORB of $12,360.60 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $7,824.26.  Applying the product of the annual update factors of 1.432 to the deflated charges of $7,824.26, the gap-filled fee schedule amount would yield $11,204.34.

159.    Payment for each claim would thus be $8,963.47 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($298.78 per cartridge).  The contractor, however, reimbursed only $1,055.66 (or $35.19 per cartridge).

*July 3, 2022, Date of Service*

160.    For Ms. Goetter's July 3, 2022, date of service, Bioscrip's list price for RELiZORB, reflected as the amount charged on each of the claims submitted for the product, was $12,360.60 for one box of 30 cartridges.  The gap-filled fee schedule amount for Ms. Goetter's claim for RELiZORB for this date of service should be calculated based on that list price.

161.    Data from other suppliers of RELiZORB also reflect that Bioscrip's 2022 prices reflected in its charges were within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

162.    Applying the gap-filling methodology to these claims and deflating the list price for one box of RELiZORB of $12,360.60 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $7,824.26.  Applying the product of the annual update factors of 1.432 to the deflated charges of $7,824.26, the gap-filled fee schedule amount would yield $11,204.34.

163.    Payment for each claim would thus be $8,963.47 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($298.78 per cartridge).  The contractor, however, reimbursed only $1,044.99 (or $34.83 per cartridge).

*e. Hunter Cooke*

164.    The supplier of Mr. Cooke is Springville Pharmacy.  For his December 24, 2021, date of service, Springville Pharmacy's list price for RELiZORB, reflected as the amount charged on the claim submitted for the product, was $22,680.00 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Mr. Cooke's claims for RELiZORB should be calculated based on that list price.

165.    Data from other suppliers of RELiZORB reflect that Springville Pharmacy's 2021 price reflected in its charges was within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

166.    Applying the gap-filling methodology to the claim and deflating the list price for two boxes of RELiZORB of $22,680.00 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $14,356.44.  Applying the product of the annual update factor of 1.363 to the deflated charges of $14,356.44, the gap-filled fee schedule amount would yield $19,567.83 for this claim.

167.    Payment would thus be $15,654.26 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($260.90 per cartridge).  The contractor, however, only reimbursed $2,028.96 (or $33.82 per cartridge) for this claim.

*f. Dennis Baker*

168.    The supplier of Mr. Baker is Option Care.  For his November 26, 2022, date of service, Option Care's list price for RELiZORB, reflected as the amount charged on the claim submitted for the product, was $24,721.20 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Mr. Baker's claims for RELiZORB should be calculated based on that list price.

169.    Data from other suppliers of RELiZORB reflect that Option Care's 2022 price reflected in its charges was within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

170.    Applying the gap-filling methodology to the claim and deflating the list price for two boxes of RELiZORB of $24,721.20 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $15,648.52.  Applying the product of the annual update factor of 1.432

to the deflated charges of $15,648.52, the gap-filled fee schedule amount would yield $22,408.68 for this claim.

171.    Payment would thus be $17,926.94 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($298.78 per cartridge).  The contractor, however, only reimbursed $2,089.99 (or $34.83 per cartridge) for this claim.

*g. Hector Bermudez*

172.    The supplier of Mr. Bermudez is Trinity Homecare.  For his December 2, 2022, and December 31, 2022, dates of service, Trinity Homecare's list price for RELiZORB, reflected as the amount charged on the claims submitted for the product, was $24,721.20 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Mr. Bermudez's claims for RELiZORB should be calculated based on that list price.

173.    Data from other suppliers of RELiZORB reflect that Trinity Homecare's 2022 price reflected in its charges was within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

174.    For each of Mr. Bermudez's claims, applying the gap-filling methodology to each claim and deflating the list price for two boxes of RELiZORB of $24,721.20 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $15,648.52.  Applying the product of the annual update factors of 1.432 to the deflated charges of $15,648.52, the gap-filled fee schedule amount would yield $22,408.68 for each claim.

175.    Payment would thus be $17,926.94 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($298.78 per cartridge).  The contractor, however, only reimbursed $2,089.99 (or $34.83 per cartridge) for each claim.

*h. Thomas Burton*

176.    Mr. Burton's supplier is Option Care.  For his June 28, 2023, date of service, its list price for RELiZORB as reflected in charges on the claim submitted for the product, was $14,585.40 for one box of cartridges.  The gap-filled fee schedule amount for Mr. Burton's claim for RELiZORB should be calculated based on that list price.

177.    Having determined the reasonable charges, the MACs next should have applied the relevant adjustment factors: the deflation factor and cumulative covered item update factors. Manual, ch. 23, § 60.3.  The deflation factor applicable here, based on the year after Alcresta applied for an HCPCS code (2016), is 0.633.  Manual, ch. 23, § 60.3.

178.    Applying the gap-filling methodology and deflating the list price for one box of RELiZORB of $14,585.40 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $9,232.56.  Applying the product of the annual update factors of 1.557 to the deflated charges of $9,232.56, the gap-filled fee schedule amount would yield $14,375.10.

179.    Payment would thus be $11,500.08 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($383.34 per cartridge).   The contractor, however, only reimbursed $1,193.17 (or $39.77 per cartridge) for this claim.

*i. Michael Curless*

180.    Mr. Curless' supplier is Clinical Specialties.  For his September 11, 2023, date of service, its list price for RELiZORB, reflected as the amount charged on the claim submitted for the product, was $14,585.40 for one box of 30 cartridges.  The gap-filled fee schedule amount for Mr. Curless' claim for RELiZORB should be calculated based on that list price.

181.    Data from other suppliers of RELiZORB also reflect that Clinical Specialties' price reflected in its charges were within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

182.     Applying the gap-filling methodology to Mr. Curless' claim and deflating the list price for one box of RELiZORB of $14,585.40 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $9,232.56.  Applying the product of the annual update factors of 1.557 to the deflated charges of $9,232.56, the gap-filled fee schedule amount would yield $14,375.10 for this claim.

183.     Payment would thus be $11,500.08 (or 80 percent of the gap-filled fee schedule amount) for one box of RELiZORB ($383.34 per cartridge).  The contractor, however, reimbursed only $1,136.02 ($37.87 per cartridge) for this claim.

*j. Joseph Sladky*

184.     The supplier of Mr. Sladky is Option Care.  For his November 23, 2023, date of service, Option Care's list price for RELiZORB, reflected as the amount charged on the claim submitted for the product, was $29,170.80 for two boxes of 30 cartridges.  The gap-filled fee schedule amount for Mr. Sladky's claim for RELiZORB should be calculated based on that list price.

185.     Data from other suppliers of RELiZORB also reflect that Option Care's 2023 price reflected in its charges was within the range of charges by other suppliers of the device.  *See supra* ¶ 129.

186.     Applying the gap-filling methodology to this claim and deflating the list price for two boxes of RELiZORB of $29,170.80 by the 2016 deflation factor of 0.633 yields a base year approximated amount of $18,465.12.  Applying the product of the annual update factors of 1.557 to the deflated charges of $18,465.12, the gap-filled fee schedule amount would yield $28,750.19.

187.     Payment would thus be $23,000.15 (or 80 percent of the gap-filled fee schedule amount) for two boxes of RELiZORB ($383.34 per cartridge).   The contractor, however, reimbursed only $2,339.30 (or $38.99 per cartridge) for this claim.

*m. Consequences of the MAC's Erroneous Application of the Gap-Filling Methodology*

188.    Because the Medicare payment amounts for Plaintiffs' use of RELiZORB were determined incorrectly, they are significantly lower than amounts paid by private insurance payors for non-Medicare patients' claims for RELiZORB.  Payments by private payors for RELiZORB show that, across the board, they reimbursed at levels above the acquisition cost to the specialty pharmacy that more closely reflect the charges by those supplier pharmacies.

189.    Medicare's payment amounts for Plaintiffs' claims are roughly 65 percent below the average payment amount of Option Care and AllCare Plus, the two largest suppliers of RELiZORB.  Likewise, the average price per cartridge paid by private payors in 2021 was $114.77, which is roughly three times the amount paid per cartridge by Medicare on the claims at issue here (ranging from $33.82 per cartridge for Ms. Goetter's October 2, 2021, date of service, to $39.77 per cartridge for Mr. Burton's June 28, 2023, date of service).  Virtually all private payors paid amounts for RELiZORB that substantially exceeded Medicare's payment amounts.

190.    Moreover, because the MACs used a $49 starting point that, as the Council acknowledged, reflected a wholesale acquisition cost to suppliers from 2017, four to five years earlier than Plaintiffs' dates of service, Medicare's current payment amounts are necessarily less than the cost the suppliers to acquire RELiZORB, not even taking into account the costs of doing business.  Indeed, the record demonstrates that in *2019*, RELiZORB's acquisition cost was $1,980.00 for one box of cartridges ($66 per cartridge), outstripping even Medicare's payment amounts on Plaintiffs' claims.  Thus, Medicare is paying far less than even the price for suppliers to acquire the product, much less the cost of doing business to furnish it to patients, and that approach violates the agency's gap-filling rules.  The result is that Medicare patients who need RELiZORB, like Plaintiffs here, face loss of access to the product.

3. *Consequences of the Unreasonable Medicare Payment Determinations*

191.    Medicare's coverage of RELiZORB *below* the supplier's cost of acquiring the product creates an unsustainable revenue loss for suppliers that effectively removes RELiZORB as a covered item for Medicare beneficiaries.  The gross Medicare underpayments will eventually leave Medicare beneficiaries like Plaintiffs without the treatment RELiZORB provides unless they can afford to pay out-of-pocket for it—further restricting Medicare patient access to the novel product and increasing other out-of-pocket health care costs.[24]  Medicare beneficiaries like Plaintiffs who qualify for Medicare on the basis of their disabilities, are a particularly vulnerable population.[25]  The inability of Medicare suppliers to afford to furnish the product, in turn, will ultimately limit Alcresta's ability to manufacture and sell RELiZORB to meet the needs of the severely ill Medicare patients who need it and have no alternative available to them.  *See Alcresta*, 755 F. App'x at 5 (concluding Alcresta has demonstrated it faces irreparable harm if patients who need RELiZORB cannot get insurance reimbursement for its cost).

192.    In addition, private and other government payors like Medicaid look to Medicare for guidance on how to pay for RELiZORB.  Medicare's underpayment for the product affects the

---

[24] Presentation and Statement of Daniel Tassé at June 8, 2017 HCPCS Public Meeting, at 7 (June 8, 2017) (explaining "Major Administrative Issues with Coding Guidance"); Letter to CMS from Asembia, at 1 (Aug. 23, 2017) (expressing "concern" and stating that "CMS should consider revisiting" its decision to include RELiZORB in the existing codes for enteral feeding supply kits); Letter to CMS from Option Care, at 1 (June 6, 2017) (explaining that "current coding for Relizorb" is "problematic").

[25] Gretchen Jacobsen et al., *Income and Assets of Medicare Beneficiaries, 2016-2035*, Kaiser Fam. Found. (Apr. 21, 2017), https://www.kff.org/medicare/issue-brief/income-and-assets-of-medicare-beneficiaries-2016-2035/ (showing median income and per capita savings for disabled Medicare beneficiaries under the age of 65 is lower than the income and savings for any other age group of Medicare beneficiaries).  The median savings for disabled individuals ($33,300) was less than half the median savings for all Medicare beneficiaries ($74,450).  *Id.*

entire market for RELiZORB.[26]  Without sufficient Medicare payment levels for RELiZORB—Alcresta's lead and only product—it may ultimately be unable to continue operations, which would leave patients without access to the only product on the market that performs RELiZORB's critical role.

193.    Medicare coverage and payment issues for RELiZORB have already imposed irretrievable economic losses, measured in millions of dollars, on Alcresta.  Alcresta is currently absorbing those economic losses while it seeks to correct the agency's reimbursement approach. Without a correction, however, Alcresta ultimately would likely be unable to provide RELiZORB to medically fragile Medicare patients.  Indeed, if there is ultimately no change to the reimbursement and continuing revenue losses force Alcresta to shut down its distribution of this product to Medicare patients entirely, the most critically ill patients requiring RELiZORB will no longer be able to access this breakthrough product.

194.    The agency's refusal to provide coverage for RELiZORB also operates to chill the incentive of companies like Alcresta to invest in and develop products that help small populations of patients who suffer from rare conditions.

## VI.    ASSIGNMENT OF ERRORS

195.    The Administrative Procedure Act ("APA") provides for a reviewing court to "set aside" the Medicare Appeal Council's decisions if, *inter alia*, they are arbitrary, capricious,

---

[26] *See, e.g.*, Jeffrey Clemens & Joshua D. Gottlieb, *In the Shadow of a Giant: Medicare's Influence on Private Physician Payments*, 125 J. Polit. Econ. 1 (2016), https://www.journals.uchicago.edu/doi/10.1086/689772 (explaining how private insurers often mimic Medicare); Roger Feldman et. al., *Medicare's Role in Determining Prices Throughout the Health Care System*, Mercatus Ctr. (Oct. 8, 2015), https://www.mercatus.org/publications/government-spending/medicare%E2%80%99s-role-determining-prices-throughout-health-care-system (explaining influence of Medicare payments on private-sector payments).

unsupported by substantial evidence in the record, contrary to law, or without observance of procedure required by law. 5 U.S.C. § 706(2).

196.    Under the APA, the Council's decisions should be set aside for many reasons including those described below.

### COUNT I – MEDICARE DETERMINATIONS ARE CONTRARY TO LAW

197.    Plaintiffs incorporate paragraphs 1 through 196.

198.    The Medicare Appeals Council's decisions regarding payment on the beneficiaries' claims are contrary to law because the contractors, at CMS's direction, did not properly apply the Medicare statute and rules governing the payment amount based on reasonable charges for medically necessary enteral nutrition and supplies.  They also specifically contradicted the agency's own recent rule providing that MSRP must not be used as the basis for a gap-filling payment calculation, and that gap-filled payment amounts must account for the full cost of furnishing the product ("including overhead and all business expenses").  The Council's decisions also contravened the D.C. Circuit's mandate for a useable code to open the path toward coverage and reimbursement for Medicare beneficiaries, and, with respect to dates of service before January 1, 2022, also violated the NCD providing for coverage of Enteral and Parenteral Nutritional Therapy.

199.    The Council's Medicare payment determinations for RELiZORB violated the Medicare payment requirements for new items because, in accordance with CMS's direct instructions to its contractors, the Council did not apply the gap-filling methodology as required to determine the charge-based payment for newly coded products that are not yet on the national fee schedule.  42 C.F.R. § 414.102(a) (requiring payment of 80% of the lesser of "actual charge[s]" or "[t]he fee schedule amount for the item or service"); 83 Fed. Reg. at 57,046 (describing gap-

filling process for establishing fees for new DMEPOS items as approximating reasonable charges); Manual, ch. 23, §§ 60, 60.3. The determination of a gap-filled amount requires: (1) a determination of reasonable charges; and (2) an application of the gap-filling rules and deflation and update factors to those reasonable charges. 42 U.S.C. §§ 1395u(s), 1395m(a)(2)-(3), (8) (mandating that fee schedule amounts for DME generally be based on average reasonable charges from 1986 and/or 1987, increased by annual covered item update factors); *id.* § 1395m(a)(14)(L); Pub. L. No. 105-33 § 4315; 42 C.F.R. § 414.102(a); 72 Fed. Reg. at 18,050; 83 Fed. Reg. at 57,046; Manual, ch. 23, § 60.3 (describing gap-filling process, including deflation and update factors).

200.    Payment for RELiZORB should plainly be determined using this gap-filling methodology because RELiZORB was at the time of these dates of service considered a newly coded product that was not yet on the national fee schedule.[27] Indeed, the agency's own instruction implementing the D.C. Circuit injunction directed the contractors to gap-fill. TDL 190132 at 2 (directing contractors to calculate fee schedule amount for RELiZORB "in accordance with the gap-filling methodology in section 60.3 of Chapter 23 of the Medicare Claims Processing Manual").

201.    Proper calculation of the gap-filled payment amount claims at issue in this Complaint would have been based on supplier charges. *See supra* ¶¶ 24-27. Using the correct methodology would have resulted in substantially greater gap-filled fee schedule payment amounts. *See supra* ¶¶ 128-87.

202.    According to briefing of Defendant in the related action, CMS directed contractors to unlawfully use a purported "MSRP" figure from the manufacturer's 2017 HCPCS coding application, a figure that represented the supplier's wholesale acquisition cost at that time and was

---

[27] *See* Press Release, Alcresta Therapeutics, Inc., *supra* note 20.

never the retail price for the product.  *See* Gov't Mot. to Dismiss at 27, *Henry I*, Dkt. No. 13.  By using this invalid starting point rather than reasonable charges to arrive at a payment amount, the contractors paid only amounts ranging from $1,014.48 ($33.82 per cartridge) for Ms. Goetter's October 2, 2021, date of service, to $1,193.17 ($39.77 per cartridge) for Mr. Burton's June 28, 2023, date of service.  This approach conflicts with CMS's own rules for determining reasonable charges; CMS itself has explained that the retail price charged by the supplier is key to this calculation, not the cost to the supplier, 84 Fed. Reg. at 60,730, because gap-filled payment amounts are intended to reflect "costs associated with furnishing items directly to the customer." *Id.* at 60,740.  The initial RELiZORB payment determinations reflect none of these factors.

203.    Further, the agency's direction that the contractors use a purported "MSRP" figure to begin calculating the proper reimbursement amount violates the agency's own coding determination, which called for RELiZORB payment to be calculated subject to "Contractor Discretion," *supra* ¶ 61, as well as the statutory and regulatory framework that establishes contractors have discretion to determine the appropriate reimbursement amount for a claim.  *See* 42 U.S.C. § 1395kk-1(a)(4)(A) (permitting contractor to determine payment amount); *see also* 42 C.F.R. § 405.904(a)(2) ("The Medicare contractor makes an initial determination when a claim for Medicare benefits . . . is submitted."); *id.* § 405.920(c) (establishing contractor "must" "[d]etermine any amounts payable" for Medicare claims); *id.* § 421.100(a)(1) (contractors "[d]etermin[e] the amount of payments to be made" on claims).  After years of applications, appeals, and litigation, in December 2018, CMS finally issued an HCPCS code indicating that RELiZORB is covered by Medicare, with payment subject to "Contractor Discretion," s*upra* ¶ 61 n.20, and instructed its contractors to apply the gap-filling process set forth in the agency's Manual, *see* TDL 190132 at 2, *supra* ¶ 62.  CMS's further instruction requiring contractors to use a

purported "MSRP" (that represents only the supplier's acquisition cost) runs counter to all controlling authorities.

204.    Additionally, the improperly low Medicare reimbursement determinations on Plaintiffs' claims reflected payments that are grossly out of line with non-Medicare payors, further evidencing that reasonable charges were not properly determined and used to arrive at the correct payment amounts.  These Medicare payments (ranging from $33.82 to $39.77 per cartridge for Plaintiffs' claims) are all below even the outdated $49 supposed "MSRP" figure the contractors used as a starting point, which reflects the cost to suppliers of acquiring RELiZORB, not its sales price.  The record before the Council confirms that virtually all private payors reimbursed *far more* for RELiZORB than Medicare, and the average price per cartridge paid by private payors was more than triple what Medicare paid for Plaintiffs' claims.  The Council's failure to apply the gap-filling methodology violated the Medicare payment rules and led to the unlawful underpayment of Plaintiffs' claims.

205.    The Council's decisions are also invalid because the contractors' denial of adequate payment constituted a change from coverage of medically necessary enteral nutrition and supplies to non-coverage, in violation of the statutory coverage provided for enteral nutrition and supplies, *see* 42 U.S.C. §§ 1395k(a)(2)(B), 1395k(a)(2)(I).  Medicare Part B covers prosthetic devices, including enteral nutrition and supplies.  42 U.S.C. §§ 1395k(a)(2)(B), 1395k(a)(2)(I); 42 C.F.R. § 421.210(b)(2) (designating DMEPOS claims as including enteral nutrition and supplies); Medicare Benefit Policy Manual, ch. 15, § 120.A; Medicare Claims Processing Manual, ch. 20, § 10.  As described above, RELiZORB is an important component of enteral nutrition for individuals who, like Plaintiffs, suffer from severe fat malabsorption.  However, the Council has effectively denied coverage through an improper gap-filling methodology that unsustainably reimburses

below a pharmacy's cost of acquisition, therefore violates both the Medicare statute and relevant rules governing payment amounts based on reasonable charges and ensuring coverage for medically necessary enteral nutrition and supplies.  In addition, at the time of the 2021 dates of service for claims in this case, RELiZORB was covered by the NCD for Enteral and Parenteral Nutritional Therapy (180.2) when deemed medically necessary, and that NCD's coverage policy is binding unless the NCD is formally amended.   42 U.S.C. § 1395ff(f)(1)(B); 42 U.S.C. § 1395y(1)(6)(A); 42 C.F.R. § 405.1060; *HCPCS Code B4105*, *supra* ¶ 61 n.20 (HCPCS B4105 RELiZORB code identified as Parenteral and Enteral Nutrition); *accord* Letter from former Secretary Alex Azar to Mark Langer, *supra* ¶ 60 (listing RELiZORB sequentially with other supplies and formula that fall under NCD 180.2 that are also identified by B-four thousand codes). No such amendment was made.

206.    In addition, the paltry payments for RELiZORB violated the D.C. Circuit's order that the Secretary remove coding barriers to payment. *See Alcresta*, 755 F. App'x at 6.  Finding that "Relizorb's encumbered code acts as an absolute barrier to meaningful reimbursement," the Court ordered the Secretary to "assign RELiZORB a temporary billing code that is not encumbered by Medicare coverage indicators that treat RELiZORB as a component of the enteral feeding supply kit (coded as B4035) not separately priced or payable." *Id.* at 2, 5.  In direct contravention of the Court's order to remove barriers to coverage and clear a path for payment for RELiZORB, CMS functionally denied coverage altogether by reimbursing the product at an unsustainably low level.

207.    The Council's decisions were therefore contrary to law and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

**COUNT II – MEDICARE DETERMINATIONS ARE ARBITRARY AND CAPRICIOUS**

208.    Plaintiffs incorporate paragraphs 1 through 207.

209.    The Council's decisions are arbitrary and capricious because the contractors' payment determinations were not based on the suppliers' reasonable charges and approached gap-filling payment for RELiZORB differently than for other products, and without explanation for the departure.  5 U.S.C. § 706(2)(A).

210.    An administrative decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"; did not "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'"; "offered an explanation for its decision that runs counter to the evidence before the agency"; or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

211.    The Council's decisions fail on all accounts.  CMS directed its contractors to use an alleged "MSRP" figure from the manufacturer's January 2017 HCPCS coding application (well before the 2021 and 2022 claims at issue here), as its starting point in the gap-filling calculation.  By doing this, the Council "entirely failed to consider an important aspect of the problem"—its duty to determine the reasonable *charges* of RELiZORB.  *See* 42 U.S.C. § 1395u(s) (administering Part B based on reasonable charges); *id.* § 1395m(a)(2)-(3), (8); Pub. L. No. 105-33 § 4315; 84 Fed. Reg. at 60,730 ("[T]he gap-filling process is used to estimate what Medicare would have paid for the item under the reasonable charge payment methodology" that was previously in effect).  According to CMS itself, those charges are more than merely the acquisition price.  As noted above, CMS has stated in the context of rulemaking that the retail price charged by the supplier—

not the cost to the supplier—is key because gap-filled payment amounts are intended to reflect "costs associated with furnishing items directly to the customer, including overhead and all business expenses such as licensure and accreditation, debt collection, credit cards, filing health insurance claims, delivery, set-up, and education." 84 Fed. Reg. at 60,740. The Medicare payment entirely fails to account for these considerations. There is no "rational connection" between this starting point using the purported *cost* to the supplier and the resultant Medicare payment that purports to reflect reasonable *charges*.

212. As further evidence these Council decisions are arbitrary and capricious, CMS has issued contradictory instructions to its contractors. Defendant admits in briefing in the related action, as well as in an email directive CMS sent to one of its contractors in connection with another Medicare beneficiary's RELiZORB claim appeal, that it has instructed contractors to use a purported "MSRP" figure of $49 as the starting point for the gap-filling analysis. Gov't Mot. to Dismiss at 27; Notice, Exs. 1-2, *Henry II*, *supra* ¶ 35; *see also* Council Decision at 2, Docket No. M-24-725 (Aug. 1, 2025; Council Decision at 2, Docket No. M-24-4190 (Sept. 5, 2025); Council Decision at 2, Docket No. M-24-431 (Sept. 2, 2025). But this directly contradicts CMS's instructions in the TDL that contractors follow the gap-filling methodology in Manual, ch. 23, § 60.3, which includes the contractors determining the proper starting point for the gap-filling analysis using the supplier's reasonable charges. *Compare* Gov't Mot. to Dismiss at 27 (directing contractors to use purported "MSRP" as starting point), *with* TDL 190132 at 2 (directing contractors to use discretion and follow gap-filling methodology in Manual, ch. 23, § 60.3); *see also* 84 Fed. Reg. at 60,739 (CMS stating that "[w]e do not believe that MSRPs represent a valid and reliable proxy for supplier charges or market prices for furnishing DMEPOS items.").

213.    CMS further contradicts itself when it recognizes that RELiZORB is medically necessary not only for individuals with cystic fibrosis, but also with endocrine pancreatic insufficiency, as stated in Defendant's NCD and the MACs' 2021 joint LCD, while simultaneously instructing contractors to make payment determinations using a purported "MSRP" figure that results in such low payment determinations that RELiZORB is effectively denied Medicare coverage.  The contractors in this case effectively denied coverage for RELiZORB by dramatically underpaying it—contrary to the NCD and the 2021 joint LCD.  The Council did not even address this contradiction.

214.    Nor has the Council offered a sufficient explanation for its decisions, and indeed it cannot offer a rational explanation that is not rebutted by the disregarded evidence of reasonable charges in the record.  In order "to survive arbitrary and capricious review, the [agency] must show that it engaged in 'reasoned decisionmaking.'"  *Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 1929 v. Fed. Labor Rels. Auth.*, 961 F.3d 452, 456 (D.C. Cir. 2020) (citation omitted).  The Council fails to justify why the contractors' payments, which are incorrectly based on a purported "MSRP" figure, are so far out of line with other payors' determinations, which are actually based on reasonable charges.  *See supra* ¶¶ 188-90.  The result is that access to RELiZORB for Medicare patients who need it is jeopardized.  Moreover, the fact that the underlying Medicare determinations are *below* the suppliers' acquisition costs and requires suppliers to provide RELiZORB to Medicare beneficiaries at a *loss* is, in and of itself, "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

215.    In addition, the Council's decisions are arbitrary and capricious because they inexplicably depart from the agency's prior interpretation of the gap-filling methodology.  The

"requirement of reasoned decisionmaking *demands*" that the agency "display awareness that it *is* changing position," *Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 186 (D.C. Cir. 2013) (emphasis added) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)), to ensure that the agency's "prior policies and standards are being deliberately changed, not casually ignored." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (citations omitted).  Although the determinations underlying the decisions at issue in this case purport to follow that methodology, the record and the resulting payment amounts show that they are not. *See Fox*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429-30 (D.C. Cir. 2020) (concluding that agency acted arbitrarily and capriciously when it made "substantive change" to governing audit standards without providing sufficient justification for "change in position").  Indeed, only a "conscious change of course adequately indicates" that an agency believes the reasons favoring the new interpretation outweigh those favoring the old one. *See Fox*, 556 U.S. at 515.

216.    Further, the Council's decisions unreasonably uphold payment determinations that were reached without any rational justification, which is also arbitrary and capricious in and of itself.  *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)); *WMI Liquidating Tr. v. Fed. Deposit Ins. Corp.*, 110 F. Supp. 3d 44, 53 (D.D.C. 2015) ("An agency may be said to have acted arbitrarily or capriciously when it disregards its established policy without adequate explanation.").  In particular, the decisions erroneously permit the contractors to depart from the established methodology for arriving at a gap-filled payment

amount, which the agency said would apply when coming into compliance with the D.C. Circuit's mandate.  "A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing cases).  The agency may change its standards, but to do so it must provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Lone Mountain Processing, Inc. v. Sec'y of Lab.,* 709 F.3d 1161, 1164 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  CMS has not explained why it "chose to do what it did." *Amerijet*, 753 F.3d at 1350 (internal quotation marks and citation omitted).

217.    The Council's decisions were therefore arbitrary and capricious and should be set aside pursuant to 5 U.S.C. § 706(2)(A).

## COUNT III – MEDICARE DETERMINATIONS ARE NOT BASED ON SUBSTANTIAL EVIDENCE

218.    Plaintiffs incorporate paragraphs 1 through 217.

219.    The Council's decisions are also unsupported by substantial evidence and should be set aside as unlawful.  There is no apparent connection between the starting point used—the purported and outdated "MSRP" figure from the manufacturer's HCPCS coding application in 2017—and its payment determinations that the appropriate, reasonable charge-based payment for Plaintiffs' RELiZORB claims range from a mere $1,014.48 ($33.82 per cartridge) for Ms. Goetter's October 2, 2021, date of service to just $1,193.17 ($39.77 per cartridge) for Mr. Burton's June 28, 2023, date of service.  As noted above, in the absence of historical base-year data, CMS was required to use the supplier's actual customary charges, which the suppliers set on their own, as the starting point for calculating the gap-filled fee schedule payment amount.  *See supra* ¶¶ 24-25, 124.  The irrational decision to use instead what Alcresta has described as the supplier's

wholesale acquisition cost—taken from an HCPCS application that was filed well before the claims at issue—is not supported by any evidence. Instead, all of the evidence indicates that the correct application of the gap-filling rules starts with the suppliers' list prices for RELiZORB, reflected as the amount charged on the claims submitted for the product. Without any evidence supporting the unexplained and unfounded conclusion to the contrary, the Council decisions must be set aside. 5 U.S.C. § 706(2)(E).

220. "Substantial evidence . . . is 'more than a mere scintilla' . . . and means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted); *see also Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence" (quoting *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365-66 (D.C. Cir. 2003) (internal quotation omitted), *cert. denied*, 540 U.S. 946 (2003)); *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996). The Medicare payment determinations cannot be upheld on this record, which is devoid of any evidence that the HCPCS application "MSRP" figure should be considered as the starting point for calculating reasonable charges under the applicable Medicare reimbursement rules and principles. Plaintiffs' evidence of other payors' reimbursements also "fairly detracts" from the determinations. *AT&T Corp.*, 86 F.3d at 247 (substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account "whatever in the record fairly detracts from its weight" (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951))). Plaintiffs' evidence proves that Medicare reimbursement for RELiZORB lags far behind reimbursement from other payors. If not corrected, any access for Medicare patients will ultimately cease. *See*

*supra* ¶ 214 (Medicare payment is substantially below acquisition price); *cf. Alcresta Therapeutics,* 755 F. App'x at 1, 5; Ex. 10, Declaration of Anastasios Konidaris at ¶ 3, *Henry I*, Dkt. No. 8-11 ("The lack of Medicare and Medicaid coverage for RELiZORB and the low rate of other insurance coverage (many private insurers follow Medicare) . . . are having an increasingly devastating impact on Alcresta."). The record simply does not contain "relevant evidence as a reasonable mind might accept as adequate" to support Medicare's gross underpayments. *Biestek*, 139 S. Ct. at 1154 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

221.    The Council's decisions were therefore unsupported by substantial evidence and should be set aside pursuant to 5 U.S.C. § 706(2)(E).

### COUNT IV – MEDICARE DETERMINATIONS ISSUED WITHOUT OBSERVANCE OF REQUIRED PROCEDURE

222.    Plaintiffs incorporate paragraphs 1 through 221.

223.    The Council's payment determinations for RELiZORB changed the substantive legal standard governing Medicare benefits and payment for enteral nutrition therapy, and also effectively constitute an NCD for RELiZORB, issued without observance of the required procedure pursuant to the Medicare rules and the APA and without providing fair notice. *See* 5 U.S.C. §§ 553, 706(2); 42 U.S.C. § 1395hh(a)(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) ("*Allina II*"), *aff'd sub nom. Azar v. Allina Health Servs.*, 587 U.S. 566 (2019). The agency did not provide *any* notice or opportunity for public comment of any change in the gap-filling methodology or for effectively issuing or amending an NCD for RELiZORB before applying these changes to Plaintiffs' RELiZORB claims.

224.    The Medicare statute "require[s] the government to provide public notice and a 60-day comment period (twice the APA minimum of 30 days) for any 'rule, requirement, or statement of policy . . . that establishes or changes a substantive legal standard governing . . . payment for

services," among other categories. *Allina Health Servs.*, 587 U.S. at 570 (quoting 42 U.S.C. § 1395hh(a)(2)); *see also Allina II*, 863 F.3d at 943 (ruling that Medicare statute does not incorporate APA's exceptions to notice-and-comment rulemaking and requires Secretary to invoke notice-and-comment rulemaking for any "requirement" that establishes or changes a binding standard that "define[s] the scope of hospitals' legal rights to payment").

225.    The agency did not provide *any* notice or opportunity for public comment of any change in the gap-filling methodology, and its decision not to follow that methodology is a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . payment for services," and thereby required, under the Medicare statute, that the agency go through notice-and-comment rulemaking, *see* 42 U.S.C. § 1395hh(a)(2); *Allina II*, 863 F.3d at 943, thereby violating the Medicare statute.

226.    The agency's change in procedure from using the gap-filling methodology is also invalid because it affects individual rights but was issued without observance of the APA's notice-and-comment rulemaking procedures. *See* 5 U.S.C. § 553(b)-(c) (to satisfy APA rulemaking requirements, an agency must publish "[g]eneral notice of proposed rule making . . . in the Federal Register" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation"); *Chrysler Corp. v. Brown*, 441 U.S. 281, 301-02 (1979). Because those procedures were not followed, the agency's actions violate 5 U.S.C. § 553(b) and (c).

227.    The underpayments for RELiZORB for dates of service after January 1, 2022 also reflect a de facto NCD for RELiZORB that was issued without observance of the statutorily prescribed procedure for adopting an NCD. *See* 42 U.S.C. §§ 1395y(a), 1395y(1)(3)-(4); *see also* 78 Fed. Reg. 48,164 (Aug. 7, 2013). Although CMS indicated that coverage determinations would

be left up to the contractors, it has issued a top-down command to the agency's contractors to use a $49 starting point to determine the gap-filled fee schedule payment amount, resulting in an unsustainably low rate of payment. The determinations to provide grossly inadequate reimbursement for RELiZORB are, in effect, determinations that RELiZORB is not covered by Medicare. This change from coverage of medically necessary enteral nutrition and supplies to non-coverage based on the agency's directive to the MACs to use an improper $49 starting point for gap-filling the fee schedule effectively constitutes an NCD, and was completed without observance of the required procedures—which include notice and opportunity for public comment on a draft proposed determination, on-the-record meetings of an advisory committee, consideration of evidence, and a clear statement in the final determinations of their basis. 42 U.S.C. §§ 1395y(a), 1395y(l)(3)-(4).

228.    In addition, underpayments for dates of service before 2022 reflect a substantive change from the NCD for Enteral and Parenteral Nutritional Therapy (180.2)—which was in effect for all dates of service prior to January 1, 2022—issued without observance of the statutorily prescribed procedure for revising an NCD. *See* 42 U.S.C. §§ 1395y(a), 1395y(1)(3)-(4); *see also* 78 Fed. Reg. 48,164 (Aug. 7, 2013). The Secretary's issuance of the NCD for Enteral and Parenteral Nutritional Therapy (180.2) constituted a binding, nationwide determination that medically necessary enteral nutrition and supplies be covered under Medicare Part B. 42 U.S.C. § 1395ff(f)(1)(B), 1395y(1)(6)(A); 42 C.F.R. § 405.1060. CMS's top-down directive to use an improper $49 starting point for the gap-filling the fee schedule effectively amended the NCD, without observing the required procedures.

229.    The agency did not provide fair notice of the change to the gap-filling methodology or for issuing a de facto NCD or departing from the NCD. Accordingly, its application of these

changed, unpublished standards is unlawful.  42 U.S.C. § 1395hh; *Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176 (D.C. Cir. 2007).  It is well settled in the Medicare context specifically, and under administrative law principles more generally, that an agency cannot apply an interpretation of its rules to penalize a party that did not have "fair notice" of the agency's view with "ascertainable certainty" that due process requires.  The concept of fair notice is especially heightened under the Medicare statute.  *See* 42 U.S.C. § 1395hh (prescribing procedural requirements Secretary must observe when making substantive changes to legal standards); *Allina Health Servs.*, 587 U.S. at 570.

230.    An agency may not impose liability on a party "for conduct that occurred well before [an] interpretation was announced.  To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'"  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012) (alteration in original) (citation omitted).  A regulated party has fair notice of the substance of a rule only when, "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform."  *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("*Gen. Elec. I*"); *see also Loma Linda Univ. Med. Ctr. v. Sebelius*, 408 F. App'x 383 (D.C. Cir. 2010) (*per curiam*) (affirming Court's reversal of Medicare reimbursement denial where appellee hospital "did not receive notice 'with ascertainable certainty'" (quoting *Gen. Elec. I*, 53 F.3d at 1329)); *Hosp. of the Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 135-42 (D.D.C. 2012) (reversing denial of Medicare payment due to lack of fair notice of agency's interpretation of its regulations); *Grancare, Inc. v. Shalala*, 93 F. Supp. 2d 24, 31-34 (D.D.C. 2000) (reversing Secretary's disallowance of Medicare

reimbursement because agency did not afford affected skilled nursing facilities fair notice of agency's interpretation of its rules). "The very concept of 'notice' of a regulatory requirement is that the government has appropriately informed the regulated community before penalizing it for noncompliance." *Hosp. of the Univ. of Pa.*, 847 F. Supp. 2d at 141.

231. The agency's change from following the gap-filling rules in determining Plaintiffs' claims and its essential non-coverage determination for RELiZORB constitute substantive changes in the Medicare reimbursement policy requiring fair notice of any change before the party is expected to conform to or be subject to the new standard. The agency did not provide fair notice of the rules prior to their enforcement, and those rules were not otherwise ascertainable to Plaintiffs, and the payment determinations based on these changes should thus be vacated.

232. Even if notice-and-comment rulemaking was not required here (which it is), the agency did not publish any standard to support the substantive changes to the gap-filling policy for newly coded products or to the coverage for medically necessary enteral nutrition and supplies, and the agency may not rely upon an unpublished standard to support a retroactive disallowance of Medicare cost reimbursement. *See Chippewa Dialysis Servs.*, 511 F.3d at 176-77 (citing 42 U.S.C. § 1395hh(c)(1) as requiring the Secretary to publish "all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability" in Federal Register, at least every three months). The Medicare statute explicitly forbids applying such a "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability . . . retroactively to items and services furnished before the effective date of the change," except in limited circumstances enumerated in the statute. 42 U.S.C. § 1395hh(e)(1)(A).

233.    The Council's decisions were therefore issued without observance of procedure required by law and should be set aside pursuant to 5 U.S.C. § 706(2)(D).

## VII.    RELIEF REQUESTED

For the foregoing reasons, Plaintiffs request that the Court:

a)  declare that the challenged Medicare Appeals Council's decisions on payment for RELiZORB furnished to Plaintiffs are contrary to law because they are inconsistent with the Medicare statute and rules for gap-filling payment amounts and coverage for enteral nutrition;

b)  declare the Council's determinations arbitrary and capricious and not based on substantial evidence;

c)  declare that the application of a new payment standard violates the procedural requirements of the Medicare statute and the APA;

d)  set aside the Council's decisions and direct the agency to require its contractors to apply properly the gap-filling methodology set forth in the Medicare statute and rules;

e)  enjoin the agency from using, or relying upon, the erroneous payment methodology with respect to RELiZORB;

f)  direct HHS to pay Plaintiffs' legal fees and other costs of suit; and

g)  provide such other relief as the Court may deem appropriate.

Respectfully submitted,


/s/ Stephanie A. Webster
Stephanie A. Webster
  D.C. Bar No. 479524
Chetan A. Patil
  D.C. Bar No. 999948
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006-6807
t: (202) 508-4859
f: (202) 383-9334
stephanie.webster@ropesgray.com

*Attorneys for Plaintiffs*

Dated:  October 31, 2025